**COMMONWEALTH**
vs.
**Frederick A. SIMONE ET AL**

**Nos. 037073, 037075
037076, 037077**

Superior Court/Suffolk, ss.
Commonwealth of Massachusetts

**June 11, 1982**

**Thomas Mundy, Asst. D.A.,** counsel for plaintiff.
**Arthur Tacelli,** counsel for defendant.

## FINDINGS, RULINGS AND ORDER

### Introduction.

In each of the above referred-to indictments which consist of two counts, the four defendants are charged with two instances of unlawfully carrying a firearm under their control in a motor vehicle. Each defendant has made a motion to suppress the firearms seized as a consequence of a warrantless search of the vehicle. On the facts, and for the reasons set out below, each motion to suppress is allowed.

### Findings of Facts.

After a hearing on the defendants' motions, from the evidence by way of testimony and inferences therefrom, I find the facts relevant and material to the relief sought by each defendant in their motions as follows: On September 4, 1981 a Friday evening, Detective Michael Cutillo, with eight years experience as a Police Officer and having served in the rank of detective during the previous three years, was in plain clothes and in an unmarked police vehicle with his partner, a Detective Nunez, also of the Revere Police Department. At sometime during the early evening hours of September 4, 1981, Detectives Cutillo and Nunez received a report of a disturbance at Zeke's Lounge, situated in Revere. In response to that radio communication, Cutillo and Nunez drove to Zeke's Lounge where they observed a large crowd of approximately twenty persons being drunk and disorderly outside of the Lounge. The Detectives also observed one Maureen Simone who was physically injured, i.e., she was bleeding and appeared to have a broken nose. Detectives Cutillo and Nunez spoke with Ms. Simone in an effort to learn who was her assailant but they did so without success. Apparently Ms. Simone had been inside Zeke's Lounge that evening and as she was leaving she observed several persons outside yelling and cursing. As she was attempting to make her way through the crowd, she was struck, knocked down, and apparently lost consciousness. She could not recall either who struck her or what occurred after she was struck for the first time. Detective Cutillo learned that Ms. Simone had been kicked in the nose by another woman. The Lounge's proprietor, a Mr. Zalenda, had telephoned the Revere Police Department as a consequence of the disturbance although he had not observed the events which occurred outside the Lounge. Detectives Cutillo and Nunez then dispersed the crowd and left.

Approximately twenty minutes later, Detectives Cutillo and Nunez received another radio communication of yet another disturbance at the Lounge and they proceeded to that location. Upon their arrival at the Lounge they observed a large crowd outside including the four defendants who because of their dress "stuck out like a sore thumb." Detective Cutillo asked Mr. Zalenda if there had been any problem with the four defendants and he responded no that they were friends of his. Detective Cutillo with his partner then began to disperse the crowd and he observed the four defendants and Mr. Zalenda go around the corner out of his, Detective Cutillo's, view. Five minutes passed and Mr. Zalenda returned bleeding from the left ear. Detective Cutillo asked Mr. Zalenda what had occurred and Zalenda denied that the defendants had struck him and denied that the defendants had guns. As Detective Cutillo was leaving the scene after having dispersed the crowd and after the defendants had left, he heard a female voice yell, "they got guns" and another person indicate that one of the four defendants was the injured woman's, Ms. Simone's, brother. I note that in fact Ms. Simone is the defendant Simone's sister-in-law.

Deciding that it would be important to determine whether or not the four defendants in fact possessed guns and whether or not they were looking for Ms. Simone's assailants, Detectives Cutillo and Nunez began to drive around searching for the defendants. After driving around the area for a few minutes, Detective Cutillo observed a 1980 Lincoln Continental travelling in a

direction away from the Lounge. That vehicle was proceeding at a moderate rate of speed on Ocean Avenue and was not engaged in any activity which should have alerted Detective Cutillo's suspicions. Despite that, Detective Cutillo began to follow that vehicle guessing that the four defendants were riding in it. Detective Cutillo then radioed ahead to alert another police vehicle and when he made contact he directed the other police vehicle to follow the Lincoln and to put on its blue lights when it was behind the Lincoln and when Detective Cutillo's vehicle arrived. When Detective Cutillo's vehicle and the other police vehicle were approximately positioned, the operator of the other police vehicle turned on its blue lights and the Lincoln immediately pulled over and was cut-off in front by Detective Cutillo's vehicle. As he was passing the other vehicle to seek to pull it over, Detective Cutillo recognized the four defendants. Detective Cutillo had previously learned that four persons were in the Lincoln via a radio communication from the other police vehicle and, just before Detective Cutillo pulled over in front of the Lincoln, he observed that the driver was one of the four defendants and that a person sitting in the front passenger seat leaned forward as if to place something under the front seat. Lincoln leaving its front and rear doors open, Detective Cutillo and his partner approached them with drawn guns and ordered them to raise their hands.

Detective Cutillo then pat-searched the defendants and found nothing. He then looked into the front seat of the Lincoln and observed the butt of the pistol sticking out from under the front seat and retrieved and seized it. Detective Nunez then searched under the front seat from the rear end and retrieved and seized another pistol. At the time when he arrested the defendants, Detective Cutillo testified that he feared for his own personal safety and I believe his testimony. He testified further that he stopped the Lincoln to determine if the four men were the same men who were at Zeke's Lounge, to determine if they had guns and to determine whether or not they were looking for Ms. Simone's assailants.

**Rulings of Law**

The stop and subsequent search of the Lincoln Continental was in my opinion, based on something less than information "sufficient to warrant a prudent man in believing that the (the occupants of the car) had committed or (were) committing an offense" **Beck** v. **Ohio,** 379 U.S. 89, 91 (1969); **Commonwealth** v. **Antobenedetto,** 366 Mass. 51, 55-56 (1974). Therefore, the Commonwealth does not and could not argue that the stop of the Lincoln Continental was based upon probable cause. Detective Cutillo conceded that he only guessed at the identity of the Lincoln Continental's occupants. As he testified, he desired to speak with the defendants solely to determine whether or not they had guns and whether or not they were looking for Ms. Simone's assailants. The speculative nature of Detective Cutillo's proposed inquiries with the defendants could not provide probable cause for the stop of their vehicle.

The gist of the Commonwealth's position is that the stop of the defendants was lawful under the principles first set forth in **Terry** v. **Ohio,** 382 U.S. 1 (1968). The **Terry** "stop and frisk" doctrine has been applied to the stop of an automobile in order to conduct a threshold inquiry of a defendant. **Commonwealth v. Riggins,** 366 Mass. 81, 86 (1974). When the Commonwealth seeks to justify a police stop of a vehicle on **Terry** grounds, the inquiry is two-fold: "first, whether the initiation of the investigation by the police was permissible in the circumstances, and, second, whether the scope of the search was justified by the circumstances." **Commonwealth** v. **Silva,** 366 Mass. 402, 405 (1974).

The determination that the initial stop and investigation by the police was permissible in the circumstances is governed by a "standard of reasonableness." **Delaware v. Prouse,** 440 U.S. 648, 653-654 (1977). Expanding

upon that principle, the facts on which the stop is based must be capable of measurement against an objective standard, **Terry, supra** at 21, whether this be probable cause or a less stringent test. **Delaware** v. **Prouse, supra** at 654. See **United States** v. **Brignoni-Ponce,** 422 U.S. 873 (1975). Because no probable cause existed in this case, the conduct of the police "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." **United States** v. **Cortez,** 449 U.S. 411, 101 S.Ct. 690, 695 (1981). This justification of police conduct must itself contain at least two elements. First, it must be based on the totality of the circumstances. Second, consideration of all the circumstances" must raise a suspicion that the particular individual (s) being stopped (are) engaged in wrongdoing." **Id.** In light of the standard set above, the Commonwealth's argument that the stop of the defendants' automobile was reasonable does not pass muster.[1]

There is no question but that the decision of Detective Cutillo to pull over the Lincoln Continental was based on the totality of the circumstances. The problem in this case is with the second prong of the **Cortez** test; that is, a consideration of the totality of the circumstances does not provide a sufficient foundation for a suspicion that unknown occupants of an automobile were engaged in wrongdoing. The Detectives' suspicion that the defendants had assaulted Mr. Zalenda, a fact which Mr. Zalenda himself denied, coupled with the assumption that an unidentified female was referring to the defendants when she said "they got guns," and the uncorroborated assertion of someone in the crowd outside of Zeke's that one of the defendants was related to Ms. Simone may arguably have provided the detectives with the quantum of articulable suspicion necessary to support an investigatory stop of the defendants. See **Cortez, supra** at 695 (Police entitled to draw inferences and make deductions about "modes"...of operations of certain kinds of lawbreakers").

The Detectives were not, however, entitled to rely upon that information to pull over the first car they guessed the defendants might be riding in. See **Commonwealth** v. **Ferrara,** 376 Mass. 502, 504 (1978) ("Slender Basis" provided for initial inquiry where defendant went three times into establishment under surveillance, drove away, then looked back at police and made a sharp turn). Here, the Lincoln Continental was not in distress of any sort (compare **Commonwealth v. Loughlin,** 385 Mass. 60 (1982); the Detectives observed nothing suspicious about either the car of its occupants (See **Commonwealth v. Bacon,** Mass. Adv. Sh. (1980) 2223); nor was there anything peculiar about the car and its direction of travel which would tie it to what happened at Zeke's (compare **Commonwealth v. Riggins, supra**).

While it is true that the Detectives recognized one of the defendants in the car pulled over in response to a police cruiser's flashing lights, that fact even in conjunction with articulable suspicions based on the events at Zeke's,[2] could not justify an investigatory stop. The Detective's "suspicion must be reasonable before the pursuit begins...For present purposes, a stop starts when pursuit begins." **Commonwealth** v. **Thibeau,** Mass. Adv. Sh. (1981) 2401, 2403.

---

1. In light of this ruling I need not, and therefore do not, reach the issue whether the search of the automobile for weapons subsequent to its stop fell within acceptable parameters. See **Commonwealth** v. **Almeida,** 373 Mass. 266 (1977). The legality of any search subsequent to a stop of an automobile alleged to be investigatory in nature at least initially rises and falls on the legality of the stop of the automobile. **Commonwealth** v. **Thibeau,** Mass. Adv. Sh. (1981) 2401, 2403.

2. Because of the view I take of this case I do not decide the issue whether any or all of this uncorroborated information was enough as a matter of law to support a ruling that the detectives had an articulable suspicion that the defendants were engaged in wrongdoing.

Therefore, the Commonwealth may not rely on the recognition of one of the defendants **after** the car pulled over to supply articulable suspicion for that stop. Cf. **Commonwealth** v. **Loughlin, supra,** at 62-63 (suspicions of officers justifying exit order must precede initial questioning of car occupants absent probable cause). Although acting in good faith, the decision of the detectives to pull over the Lincoln Continental was based solely upon a guess, **i.e.,** a hunch connected not connected in any way to the event at Zeke's. The Constitution does not allow this sort of unconstrained exercise of police discretion. **Delaware** v. **Prouse, supra** at 463; **Commonwealth** v. **Silva, supra** at 406. **Commonwealth** v. **Ellis,** Mass. App. Ct. Adv. Sh. (1981) 1680, 1681.

**Order.**

On the basis of the above findings and rulings, the defendants' motions to suppress are ordered allowed.

**Paul G. Garrity**
**Justice of the Superior Court**