COMMONWEALTH *vs.* ANDERSON L. RIGGINS.

Hampden.    May 6, 1974. — July 25, 1974.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*"Threshold" Police Inquiry. ⸱ Probable Cause. Search and Seizure. Radio Message.*

Where police officers received a radio broadcast alarm that a bank robbery had just occurred and that the two male robbers fled the scene in a red automobile heading in the direction of the officers, the officers were reasonably warranted in stopping a vehicle matching the description to conduct an investigative inquiry when they observed it at a time consistent with the time necessary for it to have travelled from the bank. [86-87]

Where inquiry of two occupants of an automobile during an investigative stop thereof by police officers revealed that neither occupant had any identification and elicited implausible answers, such answers, together with a nervous appearance of one of the occupants and

information previously received by the officers through a police broadcast concerning a recent bank robbery and flight of two robbers in an automobile, constituted probable cause to search the automobile. [87-88]

INDICTMENTS found and returned in the Superior Court on September 29, 1971.

The cases were tried before *Moriarty,* J., who denied a pre-trial motion to suppress.

*Jay M. Forgotson* for the defendant.

*William W. Teahan, Jr.,* Special Assistant District Attorney (*John T. McDonough,* Special Assistant District Attorney, with him) for the Commonwealth.

WILKINS, J. The defendant was found guilty of armed robbery, assault and battery by means of a dangerous weapon, and assault with intent to murder, all in connection with an armed robbery of a bank in East Longmeadow. Because of certain difficulties in connection with the preservation of the defendant's opportunity for appellate review by means of a bill of exceptions, the judge has reported six questions to us. G. L. c. 278, § 30. Five of these questions relate to the basic issue whether the proceeds of the bank robbery and items used in the bank robbery should have been excluded from evidence because of the manner in which that evidence was obtained.[1] The sixth question raises the procedural issue whether the judge

---

[1] These five questions read as follows:

"(1) Did Troopers Allen Witkins and Warren Seeley of the Connecticut State Police have sufficient grounds to constitutionally permit the stopping of the automobile in which the defendant was riding as a passenger when they observed it proceeding in a southerly direction on Route I-91 in East Windsor, Connecticut at approximately 10:40 A.M. on August 3, 1971?

"(2) Did Troopers Allen Witkins and Warren Seeley violate the constitutional rights of the defendant by the manner in which they stopped the automobile in which he was riding as a passenger on Route I-91 in East Windsor on the date and at the time aforesaid?

"(3) Did Troopers Witkins and Seeley have reasonable or probable cause to search the automobile in which the defendant had been riding as a passenger, and to open and look into the briefcase and the metal box which they found in that automobile, at the time when they did so on Route I-91 in East Windsor, Connecticut on the morning of August 3, 1971?

"(4) Did Troopers Witkins and Seeley have probable cause to arrest the

could properly have permitted the defendant to file his bill of exceptions late when the time for filing the bill had been allowed to expire through inadvertence of counsel.[2]

The following facts appear from the judge's findings and rulings on the defendant's motion to suppress certain evidence. During the morning of August 3, 1971, a general alarm was broadcast by police radio that an armed robbery of a bank had just occurred in East Longmeadow. The broadcast stated that the robbers were two males who had fled the scene of the crime in a red car heading south toward Connecticut on Route 83. Two Connecticut State troopers, operating separate vehicles in East Windsor, Connecticut, heard the broadcast. One of the troopers (Witkins) was familiar with Route 83 and with the area between East Longmeadow and East Windsor. He knew that there was a strong possibility that a car fleeing southerly from East Longmeadow on Route 83 would reach Interstate Route I-91, a major route running north-south from western Massachusetts to New Haven, Connecticut. About one minute after receiving the general alarm broadcast, Witkins had stationed his cruiser at the junction of Route I-91 and a southbound ramp leading onto Route I-91, where he could observe and pursue all traffic heading south on Route I-91.

The second trooper (Seeley) also proceeded to Route I-91 in his cruiser when he heard the alarm broadcast. Seeley and Witkins were in communication with each other by

---

defendant at the time when they did so on Route I-91 in East Windsor, Connecticut on the morning of August 3, 1971?

"(5) In the event that the answer to any of the foregoing questions is in the negative, should the evidence which was seized by Troopers Witkins and Seeley in the course of their search of the said automobile have been suppressed at the trial?"

It would seem that an affirmative, not a negative, answer to question two would call for an answer to question five. We have so treated question five in relation to question two.

[2] Because the judge proposed to report "any non-frivolous issues which the defendant would otherwise have raised through a bill of exceptions" and has apparently done so, there is no need for us to reconsider in this matter our decision in *Allen, petitioner,* 255 Mass. 227 (1926). In the *Allen* case, construing G. L. c. 278, § 31, we said (at 228) that a "trial judge has no power to revive the right of a defendant in a criminal case to file exceptions after the time for filing exceptions as previously limited has expired."

police radio. Seeley proceeded southerly on Route I-91 and passed the point where Witkins was stationed. Shortly, Witkins observed a red Oldsmobile automobile with white stripes on its sides, and occupied by two black males, proceeding south on Route I-91, at a speed slightly in excess of the normal flow of traffic. Witkins knew from experience that the approximate time had elapsed since the radio broadcast during which a motor vehicle would have traveled to East Windsor from East Longmeadow. Using radio communication, Witkins and Seeley coördinated their efforts so that when Seeley signaled the red motor vehicle to stop, Seeley pulled his cruiser up behind it and Witkins stopped in front of it.

Seeley approached the operator of the vehicle, one Ted Murphy, a codefendant in the Superior Court, and asked to see his driver's license and registration. Murphy produced no license but did produce a New York registration certificate issued to a "Minnie Grange" who Murphy said was his wife. During this conversation Witkins spoke with the defendant who was sitting in the front passenger's seat. The defendant, who appeared very nervous, said that he had no identification. When asked where he had been, the defendant replied that he did not know. At this point the officers conferred. Seeley returned to the vehicle to ask Murphy, the driver, where he had been. Murphy stated that they had been in Boston. The officers conferred again and agreed that it would be most unusual for a car traveling from Boston toward New York to be on Route I-91 in East Windsor. There are several more direct, more convenient routes between Boston and New York. The officers concluded that further investigation was warranted.

Witkins asked the defendant to get out of the car and "pat-frisked" him. While this procedure was being carried on, Murphy slid across from the driver's seat to the passenger's seat and asked Witkins, "Can't we talk about this?" Witkins ordered him out of the car and "pat-frisked" him also. He then searched the area of the front seat of the car and then the back seat. He noticed an unlocked, black briefcase in which there was an unlocked metal box which

contained "a great deal of money." The defendant and Murphy were then placed under arrest. Subsequent search of the vehicle disclosed, in addition to the money, a revolver, surgical gloves, stocking caps and various other paraphernalia.

The judge denied the defendant's pre-trial motion to suppress the contents of the vehicle. At trial the defendant moved unsuccessfully for reconsideration of his motion to suppress the personal property taken from the automobile. In the course of the trial relevant additional facts appeared and are set forth in supplementary findings by the judge. The radio broadcast, which resulted in the defendant's arrest in Connecticut within thirty minutes, was based on information given to a police officer by the bank's acting manager. Some of the bank manager's knowledge was the product of personal observation; the balance was obtained from a customer who was in the bank at the time of the robbery. The police officer was told that the two robbers were headed south on Route 83 toward Connecticut in a red Oldsmobile automobile with white stripes, bearing New York license plates. The officer was not told that the two robbers were black.[3] The information that the red car was an Oldsmobile, had white stripes and bore New York license plates was apparently not transmitted in the radio broadcast.

Although four questions are presented by report concerning the constitutional propriety of the police conduct, the defendant's argument is basically that the evidence should have been suppressed because the Connecticut police (1) had no constitutional right to stop the vehicle in which the defendant was a passenger and (2) had no probable cause to justify the search of the vehicle. We hold that no constitutional rights of the defendant were violated and that the evidence was properly admitted. It would

---

[3] The defendant argues that the broadcast alarm would have indicated that the robbers were black, if they had been black, and that it was therefore unreasonable to stop a vehicle with two black men in it. However, the inference seems reasonable that the color of the robbers may have been effectively concealed by surgical gloves, stocking caps, or otherwise.

indeed be difficult to accept the conclusion that in these circumstances the United States Constitution requires the exclusion of evidence which was obtained through effective interstate police work.[4]

1. The investigative stop of the red motor vehicle met the reasonableness requirement of the Fourth Amendment to the Constitution of the United States, as expressed in *Terry* v. *Ohio,* 392 U. S. 1 (1968). Although the *Terry* case involved a pedestrian, its principles are applicable as well to the stopping of a motor vehicle and its occupants. *United States* v. *Mallides,* 473 F. 2d 859, 861 (9th Cir. 1973). See, e.g., *United States* v. *James,* 452 F. 2d 1375, 1377-1378 (D. C. Cir. 1971); *Fields* v. *Swenson,* 459 F. 2d 1064 (8th Cir. 1972). If it is reasonable in the circumstances, law enforcement officers are entitled to stop a person to conduct an investigative inquiry, even if those circumstances do not present probable cause to make an arrest or to conduct a general search. *Terry* v. *Ohio, supra,* 22. *United States* v. *Catalano,* 450 F. 2d 985, 988 (7th Cir. 1971), cert. den. sub nom. *Moscatello* v. *United States,* 405 U. S. 928 (1972).

The Connecticut State troopers had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" (*Terry* v. *Ohio, supra,* at 21) the interference with the defendant's freedom which resulted from the stopping of the motor vehicle. The police officers knew that there had been a bank robbery,

---

[4] The second question asked in the report, to the extent it raises a point different from that raised in the first question, appears to relate to the assertion that, when stopped, the "get-away" vehicle was boxed in by the two police cruisers and that this physical circumstance constituted an arrest which was not constitutionally proper. From this the defendant argues that all the seized evidence was the product of an unlawful, warrantless arrest. There is no finding, or reason to infer, that the troopers intended to arrest the occupants of the red motor vehicle when they stopped it. The facts do not support the defendant's contention that continued travel was prevented by the manner in which the police cruisers were parked. We know from facts found by the judge (not directly relevant to the principal issues argued here) that while the troopers were involved in a scuffle with Murphy, the defendant, although handcuffed to the left front door handle of the red Oldsmobile, was able to drive that car away.

The fourth question deals with the lawfulness of the arrest. Except as contended with respect to question two, the defendant does not argue that there was an arrest until after the money was found. At that point there was probable cause to arrest. The defendant's real challenge is to the police conduct which preceded that arrest.

that two male robbers were involved, and that the robbers had left the scene of the crime in a red automobile, headed in a particular direction on a route which would very possibly lead them to the area on Route I-91 where the troopers had stationed themselves. Finally, the red automobile was observed on Route I-91 at a time which was consistent with the time necessary to travel there from the scene of the robbery, based on the time of the broadcast of the general alarm. The officers did not act on unsupported intuition or hunch, which would have been insufficient justification to stop the vehicle. *Terry* v. *Ohio, supra,* 22. *United States* v. *Mallides, supra,* 862. Rather, they acted on concrete facts which supported the reasonable inference that the red motor vehicle might be the vehicle involved in the robbery. There was thus a proper basis in a constitutional, as well as a practical, sense for stopping the vehicle in order to conduct an inquiry. *Commonwealth* v. *Breen,* 357 Mass. 441, 446 (1970). *Commonwealth* v. *Wilson,* 360 Mass. 557, 560 (1971). *Young* v. *United States,* 435 F. 2d 405, 408 (D. C. Cir. 1970). *United States* v. *Jackson,* 448 F. 2d 963, 969-970 (9th Cir. 1971), cert. den. sub nom. *Willis* v. *United States,* 405 U. S. 924 (1972). *United States* v. *Leal,* 460 F. 2d 385, 387-388 (9th Cir. 1972), cert. den. 409 U. S. 889 (1972). *United States* v. *Fisch,* 474 F. 2d 1071 (9th Cir. 1973), cert. den. 412 U. S. 921 (1973). Cf. *Adams* v. *Williams,* 407 U. S. 143, 147 (1972).

2. We believe that there was probable cause to search the motor vehicle without a warrant after the questioning and searching of the occupants of the vehicle. That questioning disclosed that neither occupant of the vehicle had any identification; the defendant said he did not know where he had been; and the driver, Murphy, who had no driver's license, said they had come from Boston, an unlikely point of departure considering where the motor vehicle was headed. Additionally, the defendant appeared very nervous, and when Witkins was "pat-frisking" the defendant, Murphy asked Witkins, "Can't we talk about this?" Conduct of this character, coupled with the information received in the broadcast alarm, certainly created probable

cause to search the vehicle. Implausible answers to police questions will, with other facts, support a finding of probable cause to conduct a search (cf. *Commonwealth* v. *Dottin,* 353 Mass. 439, 442 [1968]; *Commonwealth* v. *Wilson,* 360 Mass. 557, 560 [1971]), as will peculiar behavior and evasive replies. Cf. *Commonwealth* v. *Lawton,* 348 Mass. 129, 133 (1964) (arrest); *Commonwealth* v. *Chaisson,* 358 Mass. 587, 590 (1971) (arrest).

There is no question that there were exigent circumstances which, when coupled with the existent probable cause, justified the search without a warrant. *Carroll* v. *United States,* 267 U. S. 132 (1925). See *Commonwealth* v. *Haefeli,* 361 Mass. 271, 275-281 (1972); *Commonwealth* v. *Antobenedetto, ante,* 51 (1974).[5]

3. The conclusions reached in this opinion have been arrived at without consideration of those facts within the knowledge of the police in East Longmeadow which were not broadcast in the general alarm, and hence were unknown to the Connecticut troopers. These additional facts were that the "get-away" vehicle was an Oldsmobile, had white stripes and bore New York license plates. If these facts could properly be considered in determining the reasonableness of the stop and search of the vehicle, they would, of course, further justify the reasonableness of the police conduct. Where a coöperative effort is involved, facts within the knowledge of one police officer have been relied on to justify the conduct of another. *Commonwealth* v. *Lanoue,* 356 Mass. 337, 340 (1969). *Commonwealth* v. *Chaisson,* 358 Mass. 587, 590 (1971). Cf. *Commonwealth* v. *Hawkins,* 361 Mass. 384, 386-387 (1972) (no coöperative effort, knowledge not imputable). We need not, however, decide here whether the knowledge of the police in Massachusetts could properly be imputed to the State troopers in Connecticut. See *United States* v. *Morris,* 445 F. 2d 1233, 1235 (8th Cir. 1971), cert. den. 404 U. S. 957 (1971), for a case involving interstate coöperation.

---

[5] Unlike the situation in the *Antobenedetto* case, we have findings in the record which disclose the existence of a reliable source for the information which was broadcast over the police radio.

The answers to questions 1, 3 and 4 are in the affirmative; question 2 is answered in the negative; no answer is required as to question 5, as we interpret it (see fn. 1 above); and in the circumstances no answer to question 6 is needed.

*So ordered.*

TAURO, C.J. (concurring). I concur in the result which affirms judgment but I disagree with the contents of n. 5 for reasons made clear in my dissenting opinion in *Commonwealth* v. *Antobenedetto,* decided this day.