COMMONWEALTH *vs.* KEN EMUAKPOR
(and three companion cases[1]).

No. 01-P-963.

Bristol. May 13, 2002. - January 23, 2003.

Present: KANTROWITZ, DREBEN, & McHUGH, JJ.

*Practice, Criminal,* Motion to suppress. *Constitutional Law,* Search and seizure, Reasonable suspicion. *Search and Seizure,* Threshold police inquiry.

Where a police officer received a radio dispatch that an armed robbery had just occurred at a shopping mall, that two to three black males were involved, and that the robbers had left the scene in an older, grey automobile heading in his direction, the officer had reasonable suspicion to stop a vehicle when he observed it at a time consistent with the time necessary for the vehicle to travel from the shopping mall to his location, notwithstanding two minor differences between the vehicle and the information given by the radio dispatch [196-199]; further, given the kind and degree of suspicion that prompted the stop, the actions of police officers in blocking the car, approaching with drawn guns, and using handcuffs on the defendants was, in the circumstances, a proportional restraint and did not convert the stop into an arrest [199-200].

INDICTMENTS found and returned in the Superior Court Department on January 26, 2001.

Pretrial motions to suppress evidence were heard by *David A. McLaughlin,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Steven E. Gagne,* Assistant District Attorney, for the Commonwealth.

*Paul L. Carlucci* for Christopher Jackson.

*Daniel M. Rich* for Ken Emuakpor.

---

[1]One each against Archibald Kollie, Quincy Jackson, and Christopher Jackson.

*Richard W. Foster* for Archibald Kollie.

*Edward F. Sullivan, Jr.,* for Quincy Jackson, was present but did not argue.

McHUGH, J. Each of the four defendants was indicted for armed robbery and armed assault with intent to rob. At the appropriate point in pretrial proceedings, each filed a motion to suppress evidence seized by the police. After a hearing, a judge in the Superior Court concluded that the police had had an insufficient basis for stopping the defendants' automobile in the vicinity of, and minutes after, an armed robbery in a nearby shopping mall, and consequently allowed the motions. Thereafter, a single justice of the Supreme Judicial Court allowed the Commonwealth's application for leave to take an interlocutory appeal, and reported the matter to this court. We reverse the suppression order and remand these cases to the Superior Court for further proceedings.

The facts bearing on whether police had reasonable suspicion for stopping the defendants' car, as found by the motion judge and as supplemented by uncontested testimony at the suppression hearing, see *Commonwealth* v. *Rivera,* 33 Mass. App. Ct. 311, 312 (1992), are as follows: in the early evening hours of December 10, 2000, shoppers at the Emerald Square Mall (Mall) in North Attleborough were robbed at gunpoint. North Attleborough police responded to the scene and, after speaking with the victims, relayed to their headquarters by radio the following initial information: the assailants were two black males; one was armed with a handgun; one was wearing an army jacket and a black hood; the two had fled in an older, grey, two-door vehicle.

As the robbery occurred, Attleboro police Detective Timothy Cook was idling his unmarked cruiser in a parking lot adjacent to Route 1 about one mile south of the Mall and about one-half mile south of the North Attleborough-Attleboro town line. He heard his shift commander broadcast information substantially similar to the report from the scene, namely that there had been a robbery at the Mall, that two to three black males were

involved, that one of the robbers had a gun, and that the robbers had fled the scene in an older, grey vehicle.[2]

From his experience, his knowledge of the area and his observation of the holiday shoppers then crowding Route 1, Detective Cook knew that it would take about five or six minutes to drive from the Mall to his position. He also knew that the only exit from the Mall emptied on to Route 1 where a driver had to choose between going north, toward Boston, or south, toward his position and, ultimately, to Rhode Island.

Between two and four minutes after he heard the first radio dispatch, Detective Cook saw what appeared to be an older, grey,[3] four-door car containing three or four black males. The car was traveling south on Route 1, away from the Mall and toward Rhode Island. The car stopped at a traffic light and, when the light changed, moved forward, passing Detective Cook. As it did, he pulled out and started to follow.[4]

As the car continued south, Detective Cook observed that the occupants appeared relaxed. In his words, they were "kind of like chilling." Then, after a minute or two, Detective Cook saw Officer Paul Berard heading north toward the Mall in a marked cruiser, lights flashing.[5] As Officer Berard passed the car Detective Cook was following, Detective Cook saw the occupants

"turn[] almost completely around in their seats to see

[2]The broadcast information reached Detective Cook through a circuitous route. North Attleborough police at the scene of the Mall robbery radioed descriptive information to their dispatcher. That information was monitored by the North Attleborough police. Attleboro police, however, customarily were tuned to their own radio frequency and could not simultaneously listen to the content of North Attleborough broadcasts. In some fashion not reflected in the record, the North Attleborough dispatcher transmitted that information to the Attleboro dispatcher. The Attleboro dispatcher then gave the information to the Attleboro shift commander who broadcast it to the Attleboro officers.

[3]It was dark at 8:00 P.M. on December 10 and, upon later inspection, the car turned out to be light blue.

[4]Detective Cook was generally aware of the general path the broadcast information had taken before it reached him. See note 2, supra. He knew, therefore, that the robbery had occurred more than two to four minutes before he had spotted the car.

[5]Detective Cook testified that Officer Berard had also activated his siren. Officer Berard testified, and the motion judge found, that he had not. Nothing turns on the differing recollections.

what that marked unit was doing. . . . Everybody was moving around. . . . [T]hey . . . were moving. They were bending down, they were turning around, and they were really making an effort to see where that police car was going. And then a head would disappear and it would come back up."

Upon seeing the occupants' reaction to the passing police cruiser, Detective Cook decided to stop the car. His decision to do so was based on all of the information he had acquired over the radio, the time and place where the car appeared in relation to the time when the robbery took place and, in his words,

"[t]he fact that I made these observations of these guys when they seen this police cruiser going by. Their behavior changed immediately when they saw that police cruiser. When they're driving along, they're just kind of like chilling. I can see there's not a whole lot of movement in that car; and then all of a sudden this police car goes by and these guys are really on the move inside that car. To me, they were moving way too much. There was a lot more movement going on in that car than prior to that police car passing them."

Because he was in an unmarked car, Detective Cook radioed Officer Berard in his marked cruiser and asked for assistance. Officer Berard promptly arrived and, together, they stopped the suspect car. By the time they did, the officers had received information from their dispatcher that one of the suspects was wearing an army jacket, one or more spoke with a foreign accent, and that the robbers had taken jewelry, cellular telephones, and a wallet.

After the officers stopped the car, they approached it, guns drawn. As they got closer, Officer Berard saw a camouflage army jacket draped over the driver's shoulders. Then, as they got closer still and after they had ordered the occupants to keep their hands in plain view, both officers noticed that one of the vehicle's occupants spoke with an accent, and at least one was wearing jewelry.

Following those observations, the officers waited for about a minute or two until an additional officer arrived. Then the three officers ordered the four occupants, the defendants here, out of

the car, pat frisked them for weapons and placed them in handcuffs. Officer Berard searched the vehicle's interior and found a black pellet gun under the driver's front seat, a wallet belonging to one of the victims inside the glove box, and several cellular telephones. The victims were brought to the scene and identified some of the suspects as the robbers, at which point the defendants were formally placed under arrest. About five minutes had elapsed between the time Detective Cook first heard a broadcast about the robbery and the time he stopped the car.

Against that factual backdrop, the Commonwealth claims that the motion judge erred in allowing the defendants' motion to suppress. The Commonwealth argues that facts known to Detective Cook and his own observations were sufficient to warrant the stop, the resulting search of the vehicle, and the arrest of the defendants. In considering the Commonwealth's arguments, "we accept the motion judge's subsidiary findings of fact absent clear error, and we view, with particular respect, the conclusions of law that are based on them." *Commonwealth* v. *Hill*, 49 Mass. App. Ct. 58, 62 (2000), quoting from *Commonwealth* v. *Kennedy*, 426 Mass. 703, 705 (1998). However, the judge's rulings of law that "bear on issues of constitutional dimension, are open for reexamination." *Commonwealth* v. *Bottari*, 395 Mass. 777, 780 (1985). Indeed, "our duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

Applying those legal principles to the facts earlier recited, the initial stop was justified if the police had a reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom, that the occupants of the grey car had committed, were committing, or were about to commit a crime. See *Commonwealth* v. *Wren*, 391 Mass. 705, 707 (1984); *Commonwealth* v. *Lyons*, 409 Mass. 16, 18-19 (1990). See also *United States* v. *Cortez*, 449 U.S. 411, 417 (1981); *United States* v. *Hensley*, 469 U.S. 221, 229 (1985). The standard is objective and is satisfied when "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Com-*

*monwealth* v. *Mercado*, 422 Mass. at 369, quoting from *Terry* v. *Ohio*, 392 U.S. 1 (1968).

Deciding whether the police had enough facts to justify a stop is often a difficult process and this case, like many, is close. Factually, though, the case is very similar to *Commonwealth* v. *Riggins*, 366 Mass. 81, 86-87 (1974). There, the Supreme Judicial Court held that a stop was justified when the evidence showed that police officers knew there had been a robbery, that two male robbers were involved, and that the robbers had left the scene in a red car, and that the officers then observed the arrival of a red car at a time consistent with the time necessary to travel from the scene of the robbery to the place where the officers made their observations. We conclude that the facts known to Detective Cook were of the same kind and quality as the facts known to the officers in *Riggins* and require the same result. See *Commonwealth* v. *Johnson*, 6 Mass. App. Ct. 944, 945-946 (1978).

That there were two minor differences between the appearance of the car in which the defendants were riding and the information police on the scene gave to the North Attleborough dispatcher does not affect this conclusion. As noted, police on the scene said that two people were involved in the robbery and the car police stopped held four. In addition, police at the Mall said that the suspects' car had two doors and that detail was not broadcast to Detective Cook, who stopped a four-door car. These two small differences, however, do not preclude the finding that Detective Cook had an objectively reasonable basis, given the totality of the circumstances, for stopping the defendants' car. See *Commonwealth* v. *Barros*, 425 Mass. 572, 584 (1997), citing *Commonwealth* v. *Fraser*, 410 Mass. 541, 545 (1991).

With regard to the difference in the number of occupants in the car, no great leap of faith is required to know that visible robbers sometimes act with invisible cohorts. "No authority has been brought to our attention supporting the notion that a stop is justified only if the number of persons in a vehicle identified with a reported crime exactly matches the number of suspects alleged to have been involved in that crime." *Commonwealth* v. *Varnum*, 39 Mass. App. Ct. 571, 574 (1995).

Similarly, the inconsistency relating to the number of doors

of the suspected car does not alter the conclusion that Detective Cook's stop was based on reasonable suspicion. Although the existence of reasonable suspicion turns on what a percipient witness saw and not simply on what a dispatcher broadcast, see *Commonwealth* v. *Cheek*, 413 Mass. 492, 494-495 (1992), the dispatcher's omission would render Detective Cook's stop unreasonable only if an objectively reasonable officer would have passed over a four-door car after being told that the suspects were in a two-door car. But it would be "inappropriate to assume [that reasonable suspicion] cannot exist absent a full match-up of all parts of the description." 2 LaFave, Search and Seizure § 3.4(c), at 241 (3d ed. 1996); 4 LaFave, Search and Seizure § 9.4(g), at 201 (3d ed. 1996). Police "must be allowed to take account of the possibility that some descriptive facts supplied by victims or witnesses may be in error." *Ibid.* See, e.g., *Commonwealth* v. *Carrington*, 20 Mass. App. Ct. 525, 528 (1985) (*Terry* stop was lawful where suspect fit physical description but was wearing different clothing); *Commonwealth* v. *Dedominicis*, 42 Mass. App. Ct. 76, 77 (1997) (suspicion found reasonable where dispatcher stated three suspects were heading in officer's direction and officer stopped lone man who appeared nervous and was sweating during mild weather). See also *Brinnon* v. *State*, 376 So. 2d 769 (1979) (probable cause existed although dispatch description stated number of suspects was three and defendant's car held four; that car was black with red roof and defendants' car was red with black roof; and that make of car was Chevrolet and defendant's car was Ford).

A reasonable officer in Detective Cook's position could very reasonably have assumed that the victims mistakenly thought that the getaway vehicle had two doors rather than four. Indeed, the fact that the witnesses in this case were wrong illustrates that limiting police discretion to a "neat set of legal rules" is counterproductive. *Ornelas* v. *United States*, 517 U.S. 690, 695 (1996). Detective Cook knew that he was "within the range of possible flight," *Luckett* v. *State*, 259 Ind. 174, 181 (1972); that the suspects' car was older and appeared to be grey; that two to three black males were involved; and that the car's occupants reacted suspiciously upon seeing Officer Berard. See *Com-*

*monwealth* v. *Johnson*, 6 Mass. App. Ct. at 946. All "these facts, taken together, were enough evidence to support [Detective Cook's] reasonable suspicion that" the defendants had committed a crime. *Commonwealth* v. *Grandison*, 433 Mass. 135, 140 (2001). The police, therefore, had a sufficient basis to stop the car in which the defendants were riding.

"Once the [valid basis] for a stop [is] established, 'the pertinent inquiry is whether the degree of intrusion is reasonable in the circumstances.' " *Commonwealth* v. *Varnum*, 39 Mass. App. Ct. at 575, quoting from *Commonwealth* v. *Moses*, 408 Mass. 136, 141 (1990). "The extent of the danger is important in assessing whether the force used by the police in the encounter was commensurate with their suspicion. The police are, of course, entitled to take reasonable precautions for their protection." *Commonwealth* v. *Willis*, 415 Mass. 814, 820 (1993). In short, "[t]he degree of [permitted] intrusiveness . . . is that which is 'proportional to the degree of suspicion that prompted the intrusion.' " *Commonwealth* v. *Moses*, 408 Mass. at 141, quoting from *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985).

Here, the officers at the scene were facing four men whom they suspected of involvement in an armed robbery minutes earlier. They were on a highway surrounded by holiday shoppers. Blocking the car and approaching with drawn guns was, in the circumstances, a restraint proportional to the kind and degree of suspicion that prompted the stop and did not convert that stop into an arrest. See *Commonwealth* v. *Willis*, 415 Mass. at 819-821. Although use of the handcuffs frequently signals an arrest and not simply an investigatory stop, that, too, was a restraint proportional to the nature and kind of suspicion that prompted the stop.[6] See *Commonwealth* v. *Fitzgibbons*, 23 Mass. App. Ct. 301, 306-309 (1986); *Commonwealth* v. *Andrews*, 34 Mass. App. Ct. 324, 328-330 (1993); *Commonwealth*

---

[6]Indeed, by the time the defendants were placed in handcuffs, the police had seen the camouflage jacket and had heard the accent. Although we find it unnecessary to decide the point, those observations, combined with all of their other knowledge, may well have given them probable cause to arrest the defendants.

v. *Varnum,* 39 Mass. App. Ct. at 575-576; *Commonwealth* v. *Ruiz,* 51 Mass. App. Ct. 346, 350-351 (2001).[7]

The order suppressing the evidence is reversed, and the cases are remanded to the Superior Court for trial.

*So ordered.*

---

[7]The defendants properly do not argue that the search of the car's interior exceeded the bounds of an investigatory stop. "[A] . . . search [as part of an investigatory stop] may extend into the interior of an automobile so long as it is limited in scope to a protective end." *Commonwealth* v. *Almeida,* 373 Mass. 266, 272 (1977). Likewise, they do not contend that police lacked probable cause for an arrest after the stop, discovery of the camouflage jacket, foreign accent, gun, jewelry and cellular telephones, and after identification by the victims who were brought to the scene of the stop. "Probable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." *Commonwealth* v. *Moscat,* 49 Mass. App. Ct. 622, 624 (2000), quoting from *Commonwealth* v. *Storey,* 378 Mass. 312, 321 (1979), cert. denied, 446 U.S. 955 (1980). By the time of the formal arrest, there can be no doubt that the facts known to police met that standard.