## COMMONWEALTH *vs.* ROBERT CULLEN.

No. 02-P-1093.

Plymouth. October 15, 2003. - November 3, 2004.

Present: MASON, BROWN, & BERRY, JJ.[1]

*Breaking and Entering. Larceny. Assault and Battery. Constitutional Law,* Investigatory stop, Stop and frisk, Preventive detention, Probable cause. *Probable Cause.*

A Superior Court judge properly denied the pretrial motion of the criminal defendant to suppress evidence gained from a police officer's investigatory stop of the defendant's automobile, where the stop was supported by reasonable suspicion connecting the car and its occupants to criminal activity [395-397]. BROWN, J., concurring in the result.

A police officer was constitutionally supported in conducting a protective pat-frisk of the defendant, whom the officer had stopped pursuant to the investigation of a breaking and entering, where, in keeping with the plain feel doctrine, the officer had a reasonable foundation to believe that a weapon might be in the defendant's pocket, and the coins discovered in the defendant's pocket appeared to be incriminating fruits of the home burglary [397-400]; moreover, there was no prerequisite that the officer have direct knowledge that coins had been stolen in the break-in, and all of the information available to the police provided probable cause to seize them [400-402], as well as to arrest the defendant [402-403]. BROWN, J., concurring in the result.

INDICTMENTS found and returned in the Superior Court Department on March 26, 1999.

A pretrial motion to suppress evidence was heard by *Charles J. Hely,* J., and the cases were tried before *Ralph D. Gants,* J.

*Peter M. Onek,* Committee for Public Counsel Services, for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

---

[1] Justice Mason participated in the deliberation on this case prior to his death.

BERRY, J. The defendant's convictions in this case arise out of a home burglary and attack upon an elderly woman.[2] This appeal rests exclusively on a challenge to the denial of a motion to suppress evidence obtained following a *Terry-Silva*[3] investigatory stop of the car in which the defendant and an accomplice were found on the night of the break-in. The defendant lodges a threefold challenge, arguing that (1) the automobile stop was not supported by reasonable suspicion connecting the car and its occupants to criminal activity; (2) a patfrisk exceeded permissible bounds (including the bounds of the plain feel doctrine),[4] when, following an exterior pat-down of the defendant's coat, the officer felt a heavy mass of objects within and reached into the coat pocket — discovering and withdrawing a bunch of half-dollar coins, as well as numerous other coins, later confirmed to have been stolen during the break-in; and (3) the defendant's detention and transport to the hospital for a show-up identification procedure amounted to an arrest for which there was not probable cause, and, in any event, the identification was tainted by the unconstitutionality of the original automobile stop and the patfrisk.

We affirm the convictions, and hold that, at each of the turning points at issue, the lawfulness of the police actions was supported by the requisite quantum of evidence meeting constitutional standards.

1. *Factual background developed at the suppression hearing.* "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). . . . '[O]ur duty is to make an independent

---

[2]Following a jury trial, the defendant was convicted of breaking and entering a dwelling house in the nighttime with the intent to commit a felony and assaulting a person therein, G. L. c. 266, § 14; larceny of property valued at $250 or less from a person aged sixty years or older, G. L. c. 266, § 30(5); and assault and battery upon a person aged sixty years or older, G. L. c. 265, § 13K.

[3]*Terry* v. *Ohio*, 392 U.S. 1 (1968). *Commonwealth* v. *Silva*, 366 Mass. 402 (1974).

[4]See *Commonwealth* v. *Wilson*, 441 Mass. 390, 396-397 (2004) (recognizing plain feel doctrine in respect to art. 14 of the Massachusetts Declaration of Rights).

determination of the correctness of the judge's application of constitutional principles to the facts as found.' *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996)." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). To this purpose, we recite the factual findings of the motion judge, supplemented with the contextual background of uncontroverted evidence adduced at the suppression hearing.

At about 2:00 A.M. on February 24, 1999, Anne Driscoll, an elderly woman who lived alone, was awakened by the sounds of a break-in. The perpetrator kicked in the door to her house, attacked and beat Driscoll, and ransacked the house. Immediately after the attacker fled, Driscoll called 911. Brockton police officers quickly responded. Two officers proceeded to the Frost Street area near Driscoll's house, a place known to the police as a staging area for nearby house burglaries — including prior break-ins at Driscoll's house.[5] The officers found no activity at the Frost Street staging area.

Officer Royster was the first at the house, arriving about ten minutes after the attack. The officer found Driscoll shaken and injured. Her face was bruised and she was limping. Driscoll described the assault to Royster. The burglar had repeatedly hit and kicked her. Driscoll struggled against her attacker, and, as she was pushed to the ground, she grabbed a maroon cap from his head and threw it to the floor. She saw that the burglar, a white man, was balding on top, but had hair on the sides of his head. The cap lay on the kitchen floor.[6] Officer Royster radioed Driscoll's description of the attacker to the officers on patrol.

Within moments of the burglar's flight from Driscoll's house — at approximately 2:10 A.M. — a passing motorist, Paul Terry, encountered a black, two-door, hatchback automobile described as an older foreign model (a Japanese make was referenced), "barreling" out of the intersection of Frost Street and Quincy Street, which was just 900 feet from Driscoll's home. The fast-

---

[5]Frost Street, a dead-end street in a wooded area, was located three to five houses away from Driscoll's home, and items stolen from her home had been found there during previous investigations.

[6]The trial evidence included a DNA match between the defendant and substances on the maroon cap found at Driscoll's house.

moving black car almost crashed into Terry's car, and then continued forward without stopping. At a traffic light, Terry caught up to the car and, pulling alongside, observed a black male driving and a white male passenger. Notwithstanding that the passenger in Terry's car was cursing, neither man in the black car turned to look. The black car proceeded to turn left onto Main Street in the direction of downtown Brockton. A short time later, after dropping off his passenger, Terry passed Driscoll's house as he was returning home, and noticed the police cruisers outside. He stopped and related to the officers his encounter with the black hatchback car and described its two occupants. The officers at Driscoll's home broadcast the information Terry provided to other cruisers on patrol.

Sergeant Elliot was the senior officer supervising cruiser patrols this night. Elliot also was among those officers who had responded to the emergency call at Driscoll's home. While at the house, the sergeant learned from the other officers about the black car and its occupants. Elliot returned to patrol on the streets, looking for the black car. Approximately forty-five to fifty-five minutes later, at about 2:55 A.M., Elliott spotted a black foreign-looking hatchback car stopped in a "high crime area" of downtown Brockton, known in particular for prostitution and drug sales. A woman was leaning into the passenger side of the car. As Elliot's cruiser approached, the woman backed away and the black car drove off. Elliott followed.

As Elliot got closer, he saw two people in the car; the driver was a white man, balding on top, but with hair remaining on the sides of his head — consistent with Driscoll's description of her attacker. Elliot was not able to discern the characteristics of the passenger and radioed for reiteration of all the details known to the police concerning both the black hatchback automobile and the two occupants observed in it at the time of the near-collision. The information he received in a reply broadcast matched the black foreign hatchback car he was pursuing and the balding white driver. Having been at Driscoll's house, Elliot was also aware of her similar description of her attacker. At this point, Elliot activated his blue lights and siren. The black car stopped. Elliot called for back-up, then got out of his cruiser, but, before approaching the car, waited for other officers to

arrive. Among those responding was Officer Royster, who, as previously noted, had been the first to arrive at Driscoll's house and had a direct conversation with her concerning the appearance of her attacker.

Elliot and Royster approached the car. Elliot told the driver that the car fit the description of one seen near a home invasion perpetrated earlier that night, and that the driver fit the description given by the victim. Elliot saw that the driver was wearing a hooded sweatshirt, consistent with other information included in one of the series of radio broadcasts. (The sergeant was unsure whether this additional information about a hooded sweatshirt had originated with Driscoll or Terry.) The two officers ordered the driver, the defendant, to exit the car. Other officers issued a similar exit order to the passenger.

As the defendant stood outside the car, Royster performed a pat-down, felt a large mass of hard objects in the defendant's coat pocket, and heard a jingling sound as the objects moved. Royster asked what the defendant had in his pocket, to which the defendant replied, "Keys." Based on the physical qualities of the hard objects he had felt in the pat-down, Royster concluded the defendant was lying. At this point, Royster thrust his hands into the coat pocket and felt coins. He then retrieved from the pocket an unusually large number of coins, including six to twelve half-dollars. The defendant stated that his wife had given him the coins earlier that day.

Other officers performed a patfrisk of the passenger and discovered another large cache of coins, including many half-dollar coins, in his pocket.[7] At this point in time, the officers did not have direct evidence that coins were among the purloined objects taken from Driscoll's house. However, as the motion judge found, "[t]here were far more half-dollars and other coins than a citizen would ordinarily carry around in a pocket."

Following this sequence of events, Elliot and Royster placed a radio inquiry to the police officers stationed with Driscoll at the hospital, seeking verification that the defendant's physical

[7]The passenger, subsequently identified as Victor Garcia, told police that the defendant had given him the coins. Garcia entered into a cooperation agreement with the government and testified against the defendant at trial.

characteristics were consistent with Driscoll's observations of her attacker. After obtaining that verification, the officers handcuffed the defendant, placed him in a cruiser and transported him to the hospital for a show-up identification procedure.

Against this backdrop of evidence, we turn to the three discrete points at which the defendant claims his constitutional rights were violated: the initial automobile stop; the patfrisk; and the detention and transport to the hospital for the show-up identification procedure.

2. *The stop of the black hatchback car.* The defendant argues that it is purely speculative to assume that the black foreign hatchback car involved in the near collision near the Driscoll house was linked to the burglary, and equally speculative to assume that the car that Sergeant Elliott saw downtown, followed, and stopped, was the same car involved in that near crash or in the burglary.

The defendant parses the evidence too finely in asserting that speculation rather than reasonable suspicion underlay the car stop, and splinters into shards a cohesive matrix of suspicious articulable facts and reasonable inferences. It is not through piece-by-piece divisability that the requisite degree of reasonable suspicion to justify a stop is measured. Rather, the existence of reasonable suspicion is determined by unified analysis of the full context. For example, "it would be 'inappropriate to assume [that reasonable suspicion] cannot exist absent a full match-up of all parts of the description [of a suspect vehicle and its occupants].' " *Commonwealth* v. *Emuakpor,* 57 Mass. App. Ct. 192, 198 (2003), quoting from 2 LaFave, Search & Seizure § 3.4(c), at 241 (3d ed. 1996).

In this case, at the point of the stop of the black car, the police sergeant had before him not isolated and free-floating pieces of data, but rather a collection of incriminatory information, which, when studied in unity, objectively, rationally, and persuasively yielded reason to suspect that the balding white man within the black car had committed the home burglary and assault upon Driscoll and that the other man who had been present in the speeding black car close in time and place to the burglary was an accomplice. The known incriminatory informa-

tion precedent to the stop included (a) commonality in the color, hatchback style, and foreign make of the black car; (b) commonality in the number, gender, and race of the car occupants — two men, one white and one black; (c) that the incident involving the black car happened within minutes of the burglary and within 900 feet of Driscoll's home, close to a known staging area used in previous burglaries of that home; (d) a suspicious additive in the fast and reckless manner in which the black car was being operated, as if making a getaway; (e) a suspicious additive in the evasive and strange behavior by the two men in the black car — not stopping, turning their heads, or appearing to acknowledge the near crash; (f) a suspicious additive in the evasive actions by the black car as Sergeant Elliot approached it in downtown Brockton (the latter three suspicious additives being reflective of consciousness of guilt of a criminal undertaking); and (g) the connecting highly suspicious factor that the driver of the black hatchback car was a man balding on top with side hair — exhibiting a distinctive feature of the perpetrator of the home burglary and attack. Given the foregoing, in our judgment there was presented the requisite reasonable suspicion of criminal activity held constitutionally appropriate to justify the automobile stop under the standard set in *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974), and the line of cases decided in its wake.

Indeed, the stream of inculpatory facts and corresponding reasonable inferences runs deeper here than in *Commonwealth* v. *Riggins*, 366 Mass. 81, 87 (1974), where the court determined that fewer "concrete facts . . . supported the reasonable inference that the [stopped] red motor vehicle might be the vehicle involved in the robbery."[8] Specifically, in *Riggins*, we upheld an investigatory stop of a red car on Route I-91 with two men

---

[8]In addition, the defendant contends that alleged discrepancies in the descriptive details concerning the car and its occupants breaks any evidentiary loop back to the break-in. He points out that Terry saw a black man driving, while Sergeant Elliot saw a white man driving (with corresponding changes in the passenger position). The defendant also relies on the fact that Driscoll was attacked by only one man in her house, while two men were in the black car Terry encountered and Sergeant Elliot stopped. These differences in driver and the presence of an accomplice in the car, who was not seen in the home, seem like unremarkable changes in unfolding events over time. Contrast *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. at 196-199, where the police

inside where the police had only the limited information that a robbery had been executed moments earlier by two men who fled in a red automobile headed in a direction likely to lead to Route I-91. *Id.* at 86-87. See *Commonwealth* v. *Johnson*, 6 Mass. App. Ct. 944 (1978).

3. *The patfrisk and seizure of the coins.* The defendant argues that the patfrisk conducted by Officer Royster in which the coins were discovered exceeded permissible limits and that, hence, the action of taking the coins out of the defendant's pocket during the course of the patfrisk was an unconstitutional seizure, which also, in turn, tainted and rendered subject to suppression the ensuing identification procedure at the hospital. Resolution of this issue entails review of whether the police were warranted in conducting a protective patfrisk; whether the patfrisk was appropriately limited in scope; and whether, having discovered the coins in the course of that patfrisk, the officer was warranted in removing them from the pocket and seizing them.[9] We determine that the police actions at each of these points were constitutional.[10]

As to the initiation of the patfrisk, in our view the factual justification for the police officer to undertake the patfrisk met the constitutional standards set in decades of Federal and State cases. To state these governing principles: if there is reasonable

broadcast contained information that, following a shopping mall armed robbery, *two* black males, one wearing an army jacket with a black hood, had fled in an older, grey, *two-door* vehicle. *Id.* at 193. A mile or so from the robbery, police stopped what appeared to be a grey, *four-door*, vehicle with *three or four* black men inside. These discrepancies, greater than those present here, did not invalidate the automobile stop in *Emuakpor. Id.* at 198-199.

[9]The defendant's brief, in passing, also notes the exit order following the automobile stop. The challenge is weakly asserted, and rightly so, for it is without merit. Even in a routine traffic infraction stop — and this stop was much more than that — "it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999).

[10]The concurring opinion would "pretermit" analysis of whether there was an unconstitutional seizure of the coins on the basis that "there is [no] need to stitch all the events into a linear sequence." *Post* at 404. But this passing of the constitutional issues leaves open, and unaddressed, direct constitutional challenges raised on appeal — e.g., whether there was an arrest (as the judge found) at the scene of the car stop, and whether, if the seizure of the coins was improper, there was not probable cause to arrest the defendant and bring him to a show-up, rendering the latter subject to suppression.

suspicion based on objective indicia that the suspect confronting the police officer in the investigatory stop may be armed and a threat, a weapons patfrisk — which may, as necessary, include reach within a suspect's clothing to determine if a weapon is held therein — meets constitutional measure. Both art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution permit "a police officer to conduct a patfrisk for concealed weapons, provided that such a search is confined to what is minimally necessary to learn whether the suspect is armed and to disarm him should weapons be discovered." *Commonwealth* v. *Wilson*, 441 Mass. 390, 396 (2004). See generally *Terry* v. *Ohio*, 392 U.S. 1, 20-27 (1968); *Commonwealth* v. *Silva*, 366 Mass. at 405-408; *Commonwealth* v. *Dedominicis*, 42 Mass. App. Ct. 76, 77 (1997).

In this case, given the totality of the scene — involving investigation of a violent crime, a mass of heavy metallic sounding items within the defendant's pocket, and false and evasive answers by the defendant concerning what was in there — the police officer's reach into the pocket was predicated on a reasonable foundation to believe, and objective indicia that, a weapon might be secreted therein, and the inside reach was, therefore, "minimally necessary" to test whether the metal objects held within were of a dangerous nature. *Commonwealth* v. *Wilson, supra.* Further, this case record — consistent with the findings of the motion judge based on the evidence at the hearing on the motion to suppress[11] — persuasively establishes that the original exterior patfrisk, as well as the reach into the pocket, was not an evidentiary search. Rather, the police entry into the defendant's pocket was an integrated part of a safety-based weapons patfrisk and fell within these core concepts recognized in Federal and State constitutional law. Cf. *Commonwealth* v.

---

[11]With respect to the patfrisk, the motion judge found as follows. "The officers felt hard, bulky unknown objects in each defendant's pocket before they reached into the pocket. In these circumstances, I find that the officers did not exceed the permissible scope of a limited *Terry* weapons search when they reached into the defendants' pockets to assure themselves that the suspects were not armed. The officers had to make a split-second decision late at night on the streets of Brockton while confronting two men suspected of being involved in a burglary and a severe beating of an elderly woman. They were not required to gamble with their own safety."

*Blevines*, 438 Mass. 604, 608 (2003) (rejecting defendant's claim that reach into pocket where keys were found was not valid search incident to arrest: "[The defendant] contends that [the police troopers] made no claim that the key might have been used as a weapon to resist arrest or to escape. We deem such a matter self-evident and conclude that [the trooper], discovering a hard object in the defendant's rear pocket, was justified in retrieving that object as a potential weapon. . . . To the extent the search may reasonably be expected to disclose weapons, the search was proper, even if subjectively the police hoped to find other objects").

The foregoing provides constitutionally adequate basis for the sequence of police actions involving the patfrisk and the reach into the defendant's pocket, wherein the coins were discovered. We turn next to the defendant's challenge to the ensuing stage in the police actions, i.e., the taking of the coins out of the pocket and the seizure of them. The defendant submits that at the point at which Officer Royster felt coins, not a weapon, in the pocket, he was required to cease the frisk and leave the coins in station. See, e.g., *Commonwealth* v. *Ferguson*, 410 Mass. 611, 614-615 (1991). In our opinion, this challenge to the seizure of the coins, which is best analyzed as an alleged "plain feel" violation, misses the mark.

The plain feel doctrine was previously recognized in Federal law in *Minnesota* v. *Dickerson*, 508 U.S. 366 (1993) (a case on which the defendant heavily relies in his brief), and recently recognized in our State constitutional law in *Commonwealth* v. *Wilson*, 441 Mass. at 396-398 (a case decided after the filing of the defendant's brief). In the latter case, the Supreme Judicial Court considered the issue of "first impression [concerning] whether the 'plain feel' doctrine comports with the requirements of art. 14." *Id.* at 392. The court determined this issue in the affirmative, holding that, under State constitutional search and seizure law (consistent with Federal law under *Dickerson*), "a police officer may also seize nonthreatening contraband discovered during a *Terry*-type frisk if the 'police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity [as contraband] immediately apparent.' " *Id.* at 396, quoting from *Minnesota* v.

*Dickerson,* 508 U.S. at 375. The limitation upon, and caveat to, invocation of the plain feel doctrine is that, "[i]f the officer must manipulate or otherwise further physically explore the concealed object in order to discern its identity, then [plain feel is inapplicable and] an unconstitutional search has occurred." *Commonwealth* v. *Wilson, supra,* citing *Minnesota* v. *Dickerson,* 508 U.S. at 378-379.

The plain feel doctrine is the tactile analog to the plain view doctrine. *Commonwealth* v. *Wilson,* 441 Mass. at 397.[12] Thus, under both the plain view and the plain feel exceptions to the constitutional mandate of a warrant, "[1] if police are lawfully in a position from which they view [or feel] an object, [2] if its incriminating character is immediately apparent, and [3] if the officers have a lawful right of access to the object, they may seize it without a warrant."[13] *Commonwealth* v. *Santana,* 420 Mass. 205, 211 (1995), quoting from *Minnesota* v. *Dickerson,* 508 U.S. at 375. In our opinion, each of these tests is met here.

In this case, the foundation for the first and last requirements, that Officer Royster was in a lawful position and that he had a lawful right of access to the coins, flow from the validity of the automobile stop, the exit order, and the ensuing weapons-based patfrisk — all of which stages in the police encounter, for the reasons previously stated, were constitutionally supported. "The initial requirement, that the officer be conducting a valid pat-frisk of the suspect, ensures that the officer is lawfully in the position immediately to identify" the object. *Commonwealth* v. *Wilson,* 441 Mass. at 397. See *Commonwealth* v. *Johnson,* 413 Mass. 598, 601-602 (1992); *Commonwealth* v. *Dedominicis,* 42 Mass. App. Ct. at 77 & n.1, 80.

---

[12]Plain view doctrine has been applied not only to contraband, but also to fruits and instrumentalities of crime and to "mere evidence" of crime. See *Commonwealth* v. *D'Amour,* 428 Mass. 725, 730-731 (1999). Although the facts of *Wilson* involved contraband only, the analogy of plain view to plain feel logically extends to the same categories of objects — in this case, fruits of crime.

[13]Massachusetts case law also generally requires under art. 14 that the police officers came across the item "inadvertently," meaning that "the police lacked probable cause to believe, prior to the search, that specific items would be discovered during the search." *Commonwealth* v. *Balicki,* 436 Mass. 1, 10 (2002). The inadvertence requirement does not, however, apply to stolen goods. *Commonwealth* v. *LaPlante,* 416 Mass. 433, 440 n.9 (1993).

It is the second requirement which the defendant most forcefully challenges — whether the incriminatory nature of the coins was immediately apparent.[14] The defendant's argument that this was not established rests on the singular proposition that the coins could not appear to be incriminatory evidence (i.e., fruits of the break-in) unless the officer possessed direct knowledge (based on direct evidence) that coins had, in fact, been stolen in the break-in. Without direct knowledge that the coins were stolen property, it is further argued, probable cause would be lacking to justify the officer taking the coins out of the pocket and seizing them. We disagree that such direct knowledge was a prerequisite.

That an object is contraband or of an incriminating character may be established not only by knowledge dependent upon direct evidence, but also by knowledge dependent upon circumstantial evidence. In this case, the incriminating linkage between the coins and the break-in was, we believe, established by a host of circumstantial evidence. This circumstantial evidence included the similarities in appearance of the defendant, his passenger, and his car to the descriptions given by the victim Driscoll and the motorist Terry; the sheer number of coins which Royster felt within the pocket — which the motion judge found consisted of an "unusually large, bulky assortment of coins," greater in number than a person would ordinarily carry around; and the defendant's changing and false exculpatory stories about keys, alchemized to coins. All of these facts circumstantially, but compellingly and logically, yielded the probable conclusion that the coins in the pockets of the defendant and his compatriot were among the swag from the home burglary. We, accordingly, reject the defendant's contention that the officer's lack of direct knowledge and direct evidence that coins were stolen precluded meeting the plain feel requirement that the object coins appeared to be incriminating fruits of the home burglary.

[14]The plain feel requirement that the incriminatory nature of the concealed object be properly established without physical manipulation is not implicated in this case. It was obvious from the exterior pat-down of the defendant that hard and metallic sounding objects were within the defendant's pocket. Once the officer reached inside, without manipulation, the coins were felt and identified.

The foregoing analysis of whether it was immediately apparent that the coins were incriminating stolen goods logically segues to, and interrelates to, whether the officer had probable cause to seize them. Under both the plain view and feel doctrines, whether a thing plainly viewed or plainly felt may be constitutionally seized is to be measured by whether there is probable cause to believe in the incriminating character of the object. See *Arizona* v. *Hicks*, 480 U.S. 321, 326 (1987) (probable cause required for plain view seizure); *Minnesota* v. *Dickerson*, 508 U.S. at 375 (announcing same principle for plain feel seizure); *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 303-304 (1979); *Commonwealth* v. *LaPlante*, 416 Mass. 433, 440 (1993); *Commonwealth* v. *Cruz*, 53 Mass. App. Ct. 24, 33 & n.7 (2001).

All of the information just described and available to the police, we conclude, forged a strong connection to the break-in and, in our judgment, provided probable cause to seize the coinage as loot from the crime. Probable cause to seize evidence rests on knowledge of the facts and circumstances that would have warranted a person of reasonable caution in believing that the thing possessed is evidence of crime. See *Commonwealth* v. *Hason*, 387 Mass. 169, 173-177 (1982); *Commonwealth* v. *Sabetti*, 411 Mass. 770, 776 (1992). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Commonwealth* v. *Cast*, 407 Mass. 891, 895 (1990), quoting from *Draper* v. *United States*, 358 U.S. 307, 313 (1959).[15]

4. *The arrest and show-up identification.* At the hearing on

---

[15]The record also presents a different and constitutionally justifiable basis for the retrieval of the coins. Because the police had probable cause to believe the defendant was the home burglar at the time the officer felt and identified the unusual mass of coins within the defendant's pocket, then the officer's seizure of those coins can be justified as incident to the defendant's lawful arrest. The fact that the defendant was only thereafter placed under formal arrest does not invalidate the seizure. See *Commonwealth* v. *Johnson*, 413 Mass. at 602 ("The fact that the search preceded the formal arrest is not important, 'as long as probable cause [to arrest] existed independent of the results of the search' "), quoting from *Commonwealth* v. *Santiago*, 410 Mass. 737, 742 (1991). See also *Commonwealth* v. *Brillante*, 399 Mass. 152, 154 n.5 (1987)

the suppression motion, Royster testified that, after discovering the coins and calling the hospital to confirm the victim's description of her assailant, he "placed [the defendant] in handcuffs, put him in the back of the cruiser, [and] brought him to the hospital for a one-on-one [between] . . . [t]he victim and the suspect." Although Royster did not refer to this as an arrest, the motion judge found that, at this stage, there was an arrest and probable cause to support that arrest. The judge reasoned that "[a]llong with all the previously known information, the discovery of two troves of half-dollars and other coins, one on each defendant, . . . gave the officers probable cause to arrest the defendants and probable cause to search the car."[16]

On appeal, the defendant challenges this probable cause to arrest determination. Prescinding to the next stage, it is asserted that the show-up identification should have been suppressed because, given an unconstitutional arrest, the defendant was unlawfully detained and transported to the hospital for the identification procedure.

We conclude in this analysis, consistent with what we have said earlier, that events unfolding immediately after the automobile stop only served to supplement the extant articulable facts comprising reasonable suspicion that had preceded that stop. Cemented together, the pre- and post-stop facts, and reasonable inferences flowing therefrom, established probable cause to believe that the defendant had committed the home invasion and attack on Driscoll. The arrest and show-up procedure were therefore constitutionally permissible.

*Judgments affirmed.*

BROWN, J. (concurring in result). Although this appeal suggests a myriad of intriguing questions of constitutional dimension — (1) was the stop based on reasonable suspicion; (2) (a) was the frisk warranted, (b) did it exceed permissible

---

("the search correctly is analyzed as one incident to arrest because, immediately after the search, the troopers placed the defendant under formal arrest").

[16]The defendant has not challenged the car search on appeal.

limits; and (3) was there probable cause to arrest? — upon review of the entire scenario, I do not think there is a need to stitch all the events into a linear sequence. From all that appears, the police had probable cause to arrest the defendant at the time of the show-up in the victim's hospital room. Concluding as I do, I pretermit the questions whether the patfrisk exceeded the limits of *Terry* v. *Ohio*, 392 U.S. 1 (1968), and whether there was probable cause to arrest the defendant at the time of the initial stop.[1]

I am merely obliged to examine whether the stop, detention, and transport to the show-up were legally justified. I think they were. The stop was permissible under the authority of *Commonwealth* v. *Riggins*, 366 Mass. 81, 86-87 (1974), and *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. 192, 196-199 (2003). See *Commonwealth* v. *Johnson*, 6 Mass. App. Ct. 944, 945-946 (1978).

The show-up identification was not fatally flawed. See *Commonwealth* v. *Barros*, 425 Mass. 572, 585 (1997). On my reading of the motion hearing transcript, contrary to the defendant's assertion, I do not believe Officer Royster's actions prior to the show-up necessarily amounted to an arrest. See *Commonwealth* v. *Gordon*, 47 Mass. App. Ct. 825, 826-827 (1999). Despite the use of handcuffs to restrain the defendant, see *Commonwealth* v. *Varnum*, 39 Mass. App. Ct. 571, 575 (1995) (use of handcuffs does not automatically convert *Terry* stop into arrest), I conclude that Officer Royster was still acting within the limits of a *Terry* stop. Thus, I need not reach the defendant's argument that probable cause to arrest did not arise during the stop of the defendant's car. I conclude that reasonable suspicion sufficient to justify the challenged police conduct was present at the time Elliott stopped the defendant's car.[2]

---

[1] The view I take would make it unnecessary for the court to consider whether *Minnesota* v. *Dickerson*, 508 U.S. 366 (1993), is implicated in the instant circumstances. See *Commonwealth* v. *Wilson*, 441 Mass. 390, 396-398 (2004).

[2] Whether the coins could properly have been seized at the time of the stop by the officers is not a matter of consequence, and there is no need to factor that into the calculus of the conviction. The requisite reasonable suspicion for the police actions leading to the show-up was present before the seizure, and the nature of the coins was a matter of inevitable discovery. See *Commonwealth* v. *O'Connor*, 406 Mass. 112, 115-119 (1989).