## COMMONWEALTH *vs.* JOSE M. MARTINEZ.

No. 07-P-1424.

Suffolk. November 4, 2008. - May 11, 2009.

Present: McHUGH, SIKORA, & RUBIN, JJ.

*Practice, Criminal,* Motion to suppress. *Search and Seizure,* Threshold police inquiry, Probable cause, Protective frisk. *Constitutional Law,* Search and seizure, Stop and frisk, Probable cause. *Arrest. Probable Cause.*

A Boston Municipal Court judge did not err in granting a criminal defendant's motion to suppress evidence obtained by police during a stop, patfrisk, and arrest of the defendant on a porch and in the common area of an apartment building, where there was no reasonable, articulable suspicion of criminal activity sufficient to support the stop of the defendant in the apartment building prior to the patfrisk, and where there was insufficient evidence in the record to support a conclusion that at the time of the patfrisk the police had a reasonable belief based on specific and articulable facts and the reasonable inferences following therefrom that the defendant was armed and dangerous [245-248]; similarly, statements made by the defendant to officers after the arrest, which were results of the unjustified stop and frisk, also required suppression [249-250]. RUBIN, J., concurring in the result.
In an appeal from a judge's order granting a pretrial motion to suppress in a criminal matter, this court declined to consider an argument that the Commonwealth did not raise before the motion judge. [250]

COMPLAINT received and sworn to in the West Roxbury Division of the Boston Municipal Court Department on September 5, 2006.

A pretrial motion to suppress evidence was heard by *Kathleen E. Coffey*, J.

An application for leave to prosecute an interlocutory appeal was allowed in the Supreme Judicial Court for the county of Suffolk by *Judith A. Cowin*, J., and the appeal was reported by her to the Appeals Court.

*Kathleen Celio*, Assistant District Attorney, for the Commonwealth.

*Rose E. King* for the defendant.

SIKORA, J. The Commonwealth takes this interlocutory appeal from a Boston Municipal Court judge's grant of the defendant's motion to suppress evidence and statements. The issues arise from a stop, patfrisk, and arrest of the defendant on a porch and in the common area of an apartment house in the Mission Hill section of Boston. The patfrisk produced a handgun and ammunition. After the defendant's arrest, police officers also found a substance believed to be marijuana and a pill of apparent Class E character in the possession of the defendant. The defendant sought to suppress that evidence as well as statements made to officers after his arrest. We affirm the judge's order suppressing the evidence and statements. The ground of decision is that the stop and patfrisk lacked the support of reasonable suspicion.

*Background.* In the absence of clear error, the motion judge's findings are final. *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990). We supplement those findings with uncontested testimony from the motion hearing. See *Commonwealth* v. *Isaiah I.,* 448 Mass. 334, 337 (2007), and cases cited (appellate courts "may supplement a judge's finding of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony"). In this instance, the detail and clarity of those findings are especially helpful for the application of appropriate doctrine.

The only two witnesses to testify at the hearing were Boston police Officer Michael Flaven and Marielis Rosado, the defendant's female companion at the time of the events in question. At the end of the hearing the judge stated, "I found the officer to be very credible, and I thank him for his honesty . . . . I find him to be a credible, hardworking officer who was investigating a legitimate 911 call." At the same time, the judge derived critical findings from Rosado's testimony. See *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980) ("The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses . . ."). Although the judge's findings describe Rosado as the defendant's "girlfriend," Rosado did not use that term to describe their relationship. Nevertheless, in light of the testimony of the two witnesses, which the judge credited either explicitly or implicitly, the finding that Rosado was the defendant's girlfriend is not clearly erroneous.

On Saturday, September 2, 2006, at approximately 5:00 A.M., Officer Flaven and Officer McDonough received a dispatch on their police radio stating that a 911 caller had reported an attempted breaking and entering of a residence at 13 Sachem Street in the Mission Hill neighborhood. The dispatcher described the suspect as a twenty-four year old white male wearing blue jean shorts and a gray T-shirt with orange stripes and "some kind of writing on the front."[1] In uniform and in a marked police vehicle, the officers drove past 13 Sachem Street and did not see any evidence of an attempted breaking and entering. The officers had not noticed any pedestrians or moving vehicles in the vicinity until Officer McDonough saw the defendant walking on Hillside Avenue, which runs perpendicularly to Sachem Street. The officers noticed that the defendant was wearing a white T-shirt under a long-sleeved, multicolored, button-down shirt and was accompanied by a woman, later identified as Marielis Rosado.

The officers wanted to question the defendant to determine whether he was involved with the attempted breaking and entering reported in the dispatch. The series of one-way streets in the neighborhood required them to drive around the block to approach the defendant. When they reached him, he was walking with Rosado on Darling Street, which runs in parallel to Sachem Street and perpendicularly to Hillside Avenue. As he walked, the officers drove alongside him. One of the officers asked him

---

[1]The judge's findings state that "[t]he suspect was described in the broadcast as a 24 year old white male wearing a gray T-shirt with an orange stripe." In the recording of the dispatch, which the judge heard at the motion hearing, the dispatcher says that the suspect was "wearing a gray t-shirt with orange stripes. There's some kind of writing on the front of the shirt . . . and blue jean shorts."

If police rely upon a radio broadcast or dispatch to conduct a threshold inquiry, the Commonwealth must demonstrate a basis of reliable information in support of the transmitted information. *Commonwealth* v. *Riggieri*, 438 Mass. 613, 615-617 (2003). *Commonwealth* v. *Walker*, 443 Mass. 867, 872, cert. denied, 546 U.S. 1021 (2005). If the source of the broadcast information is anonymous, the Commonwealth may cure the unreliability of the informant by police observation or corroborating details of the broadcast information. *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990). In the present case, no evidence indicated the reliability of the broadcast and no observation of the police supported the report of an attempted break-in. These deficiencies weaken the basis for reasonable suspicion of criminal activity of the defendant discussed below.

his name. He replied truthfully, "Jose." The officers noticed that the defendant was Hispanic and had light-colored skin. He appeared to be in his early twenties. He appeared also to be nervous.

After the defendant's response, the officers stopped their vehicle and got out. They followed the defendant and Rosado up a set of stairs onto the front porch of 30 Darling Street, a small three-story apartment house where Rosado lived. As Officer Flaven approached the defendant, he noticed that the defendant's shirt was long-sleeved and gray with "a little bit of blue in it," as well as with vertical "orange stripes." Officer Flaven noticed also that the defendant had a cast on his arm.[2] The defendant had not attempted to flee from the officers nor had he made any furtive gestures.[3]

On the porch, the officers asked the defendant for identification. He produced a Massachusetts identification card. As they examined the card, the defendant and Rosado entered the apartment house. The defendant then locked the building's front door.[4] He stood behind Rosado, put his hands on her hips, and whispered something in her ear.[5] He then walked up the flight of stairs inside the front door.[6]

Rosado remained immediately inside the door. Officer Flaven told her, "Open the door or I'll fucking kick it in." She was afraid that, if she did not open the door, the officer would have forcibly entered the building and caused property damage. So she unlocked and opened the door. Officer Flaven entered the building and climbed the stairs to meet the defendant. He grasped the defendant and brought him downstairs and outside. Officer McDonough conducted a patfrisk of the defendant and found a

[2]Officer Flaven testified to the defendant's appearance as the officers approached him on foot. We include it here to compare the defendant's appearance with the dispatch's description of the suspect.

[3]Officer Flaven testified to these facts at the hearing.

[4]The record does not indicate whether the door was locked before the defendant's entry.

[5]Officer Flaven testified to this observation.

[6]The space behind the front door of 30 Darling Street is a common area used by the building's tenants. It includes a hallway and a narrow staircase. During Officer Flaven's testimony, the Commonwealth submitted photographs of the common area in evidence. Some of those photographs are part of the record on appeal.

loaded handgun. Officer Flaven then asked the defendant for his license to carry a firearm. The defendant told the officers that he did not have one. They placed him under arrest.

As the officers led the defendant away from the building, he said to Rosado, "Bye, bye baby, see you later. I am going away for a long time." At the police station, Officer Flaven advised the defendant of his Miranda rights. The defendant told the officer that he had found the gun and that he carried it because he had been shot at twice. Police searched the defendant during the booking process and found marijuana and a small blue pill. With regard to the pill, the defendant, without being asked, told Officer Flaven, "It's Viagra. The girl I was with tonight. I was going to use it with her."[7]

The motion judge concluded that the officers had not seized or stopped the defendant when they had stood on the porch with him, asked for identification, and received his identification card. She concluded further that Officer Flaven's warrantless entry into 30 Darling Street was unlawful because it lacked the support of probable cause and exigent circumstances or consent. She suppressed all evidence seized from the defendant and all of his postarrest statements as the products of the unlawful entry.

*Discussion.* From the findings by the motion judge, we "make an independent determination of the correctness of the judge's application of constitutional principles" to those facts. *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). The reviewing court may affirm a suppression decision upon any ground supported by the record, even if the motion judge did not rely upon it. *Commonwealth* v. *Va Meng Joe*, 40 Mass. App. Ct. 499, 503 n.7 (1996), *S.C.*, 425 Mass. 99, 102 (1997). *Commonwealth* v. *Eggleston*, 71 Mass. App. Ct. 363, 367 n.4 (2008), *S.C.*, 453 Mass. 554 (2009). We conclude that the stop and frisk of the defendant lacked the support of reasonable suspicion under the Fourth Amendment to the United States Constitution standards of *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968), and *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974). That deficiency provides an independent and alternative basis for suppression of the evidence and statements.

[7]Officer Flaven testified to these comments.

1. *The stop and frisk.* a. *The stop.* Under Massachusetts law, a police officer has seized a person "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Commonwealth* v. *Borges*, 395 Mass. 788, 791 (1985), quoting from *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.). When an officer pursues a person and the pursuit, viewed objectively, indicates that the person is not free to leave the area without responding to the officer's inquiry, the officer has seized that person. *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996). An officer may seize a person if he reasonably suspects that the "person has committed, is committing, or is about to commit a crime." *Commonwealth* v. *Silva*, 366 Mass. at 405. That reasonable suspicion must "be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience." *Id.* at 406. "The facts and inferences underlying the officer's suspicion must be viewed as a whole when assessing the reasonableness of his acts." *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981).

We must allow officers "to take account of the possibility that some descriptive facts supplied by victims or witnesses may be in error." *Commonwealth* v. *Emuakpor*, 57 Mass. App. Ct. 192, 198 (2003), quoting from 2 LaFave, Search and Seizure § 3.4(c), at 241 (3d ed. 1996); 4 LaFave, Search and Seizure § 9.4(g), at 201 (3d ed. 1996). Thus, reasonable suspicion can exist "absent a full match-up of all parts of the description." *Ibid.* Yet "[n]either evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support the reasonable suspicion necessary to justify a stop and frisk." *Commonwealth* v. *Mercado*, 422 Mass. at 371.

At no point during the encounter did the officers reasonably suspect that the defendant had committed, was committing, or was about to commit a crime. See *Commonwealth* v. *Silva, supra* at 405. The defendant's appearance did not sufficiently resemble the dispatcher's description of the person who had allegedly attempted a breaking and entry. The defendant is Hispanic and has light-colored skin. The dispatcher described the suspect as white. The defendant was wearing a white T-shirt under a long-

sleeved, button-down shirt, and he had a cast on one arm. His shirt was multicolored, with both blue and gray elements and some orange stripes. The dispatcher described the suspect as wearing a gray T-shirt, with orange stripes and with script on the front. The dispatch did not refer to a long-sleeved shirt or to an arm cast. The defendant was wearing long pants, not blue jean shorts.

The presence of Rosado, the defendant's girlfriend, has significance. The dispatcher did not cite the accompaniment of a woman. When the officers first spotted the defendant, he was with Rosado. Her presence, viewed objectively, decreased suspicion that the defendant was the person who allegedly had attempted the breaking and entry.

b. *The frisk.* An officer may frisk a person for weapons if a reasonably prudent person in the officer's position "would be warranted in the belief that the safety of the police or that of other persons was in danger." *Commonwealth* v. *Silva*, 366 Mass. at 406. "[T]he officer need not be absolutely certain that the individual is armed," *ibid.*, but the officer must be aware of specific facts warranting a reasonable person to fear for his safety. *Commonwealth* v. *Va Meng Joe*, 425 Mass. at 102 & n.7.

Here, the officers' observations do not support a reasonable belief that the defendant was armed and dangerous. See *Commonwealth* v. *Silva, supra*. The dispatcher did not report that the person who attempted the breaking and entering was armed. See *Commonwealth* v. *Murphy*, 63 Mass. App. Ct. 11, 18 (2005), and cases cited (lack of reports of weapons at crime scene was one factor contributing to conclusion that frisk was unlawful). Nor did any element of the defendant's conduct suggest that he had a weapon or that he intended to harm anyone. The officers did not see the defendant assault, or attempt to assault, anyone. See *ibid.* (no observation of assaultive conduct was another factor contributing to conclusion that frisk was unlawful). He made no furtive gestures, such as grabbing his waistband or shielding part of his body from the police, and the officers did not observe a bulge in his clothing. See *Commonwealth* v. *Johnson*, 413 Mass. 598, 601 (1992) (officers' observation of defendant reaching into his pants was one factor supporting lawful frisk); *Commonwealth* v. *DePeiza*, 449 Mass. 367, 371-372 (2007) (defendant shielding bulge in his jacket from police contributed to finding of

reasonable suspicion to stop and frisk); *Commonwealth* v. *Murphy, supra* (frisk unlawful where, in addition to other factors, police did not see bulge or furtive gestures).[8] In short, a reasonable person would not have feared for his safety after witnessing the defendant's behavior. See *Va Meng Joe*, 425 Mass. at 102; *Commonwealth* v. *Gomes*, 453 Mass. 506, 512-514 (2009) (insufficient facts to support reasonable inference that defendant was armed and dangerous). More than any other factor in this case, the invalidity of the frisk bars the resulting evidence.

c. *Countervailing evidence.* The defendant's proximity, in both time and location, to the reported attempted breaking and entering would draw police attention. The streets of Mission Hill were deserted at 5:00 A.M. Compare *Commonwealth* v. *Carrington*, 20 Mass. App. Ct. 525, 529 (1985) (two factors supporting probable cause for arrest were early morning hour and short distance between location of stop and crime scene); *Commonwealth* v. *Quinn*, 68 Mass. App. Ct. 476, 480 (2007) (stop was proper where motor vehicle was driving away from crime scene within minutes of crime and was only vehicle on road). The defendant's abandonment of his identification card by retreat behind a locked door created some suspicion. Compare *Commonwealth* v. *Sanchez*, 403 Mass. 640, 645 (1988) (flight from police after consenting to search and before police pursuit provides reasonable suspicion). Nonetheless, the combination of those factors did not accumulate to a level of reasonable suspicion that the defendant had committed, was committing, or was about to commit, a crime. Nor did that combination equal a reasonable belief that the defendant was armed and dangerous.[9]

---

[8]Nervous or fidgety demeanor alone does not substitute for furtive movement. *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 669 (1999). *Commonwealth* v. *DePeiza*, 449 Mass. at 372.

[9]In the course of oral argument at the conclusion of the evidentiary hearing, the motion judge pointedly addressed the issue to counsel for the Commonwealth:

THE COURT: "But what are the requirements under *Terry*? Not only do the officers have to have a reasonable, articul[able] suspicion that the person is committing a crime, or is about to commit a crime, but don't they have to have reasonable, articul-[able] suspicion that the person is armed and dangerous? And what factors in this pattern, in this situation, would suggest that they had a concern for their safety . . . ?"

We do not decide whether the officers seized the defendant on the porch prior to his entry of 30 Darling Street, although that conclusion could be reasonable.[10] Compare *Commonwealth v. Barros*, 435 Mass. 171, 175-176 (2001) (officer's pursuit of defendant by leaving cruiser, approaching him after being rebuffed, and ordering him to "[c]ome here" was highly relevant in determining whether defendant was seized); *Commonwealth v. DePeiza*, 449 Mass. at 370-371 (defendant not seized because officers used conversational tone, did not block defendant's path, and did not order defendant to stop or answer questions), and cases cited. At the latest, the defendant was seized when Officer Flaven grasped him on the stairway.[11] A reasonable person would not feel free to leave when a police officer had mounted a flight of stairs and taken hold of him after ordering his companion to open a locked door and threatening to kick it in. See *Commonwealth* v. *Pimentel*, 27 Mass. App. Ct. 557, 560 (1989), quoting from *United States* v. *Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.) (two examples of police conduct evidencing seizure are "physical touching of the person of the citizen" and "use of language or tone of voice indicating that compliance with the officer's request might be compelled"). It makes no difference, though, whether we determine that the seizure or stop occurred when Officer Flaven grasped the defendant or at an earlier point in time. Under either analysis, the officers did not have reasonable suspicion that the defendant was involved in criminal conduct or a reasonable belief that he was armed and dangerous.[12]

---

[10]As mentioned above, the motion judge concluded that the officers had not seized the defendant prior to his entry of 30 Darling Street. In doing so, the judge relied on the defendant's responses to the officers' conduct, such as willingly answering their questions, producing identification, and entering the building.

[11]Arguably, Officer Flaven seized the defendant by ordering Rosado to open the door and threatening to kick it in. See *Commonwealth* v. *Ramos*, 430 Mass. 545, 549 (2000) ("The defendant . . . was seized . . . when the police notified her that they would not leave until she came out of the apartment and that if she continued to refuse, they would have the fire department break down the door").

[12]A more expansive view of reasonable suspicion for a stop or seizure of the defendant on the interior stairs (strengthened by his abandonment of his identification card on the front porch) would still not overcome the hurdle of the unsupported frisk and therefore would still not lead to the admissibility of the frisk products.

2. *Unwarranted entry of the residential building.* At the conclusion of the evidentiary hearing, the judge invited the oral argument of all counsel upon the issues of both the validity of the stop and frisk and the police entry into the residential building without a warrant. The Commonwealth responded that the entry had resulted both from the consent of Rosado because she had unlocked and opened the door and from the exigent circumstance of the defendant's likely flight and escape through another exit. The Commonwealth made no reference to the rationale of *Commonwealth* v. *Dora*, 57 Mass. App. Ct. 141, 144-148 (2003), that the tenants of a multi-unit residential building enjoyed only a qualified or diminished expectation of privacy in its common area hallways and therefore only reduced constitutional protection against police entry and search in those places, even trespassory police entry.[13]

The judge invited posthearing memoranda upon all suppression issues. The Commonwealth, as appellant, has not included in its record appendix any written memorandum demonstrating its presentation of a subsequent *Dora* argument to the judge. It had the duty to do so or else suffer the waiver of the argument on appeal. See *Commonwealth* v. *Best*, 50 Mass. App. Ct. 722, 729 (2001); *Commonwealth* v. *Giacobbe*, 56 Mass. App. Ct. 144, 149 (2002). After her thorough subsidiary findings, the judge rested her decision of suppression exclusively upon the ground that the police entry into the hall and stairway had constituted the invasion of a dwelling without freely given consent and without probable cause to search in exigent circumstances. Her discussion contained no reference to the authority or reasoning of *Dora*. On appeal, the Commonwealth has relied upon the authority of the *Dora* reasoning in its brief and oral argument.

---

[13]The *Dora* court concluded its analysis of common area privacy with the following passage.

> "While a technical trespass by police officers theoretically may have civil implications, how they gain access to the common hallways of a multi-unit apartment building is of no constitutional consequence. 'An expectation of privacy necessarily implies an expectation that one will be free of *any* intrusion, not merely unwarranted intrusions.' *United States* v. *Eisler*, 567 F.2d [814], 816 [8th Cir. 1997] (emphasis in original)."

*Commonwealth* v. *Dora*, 57 Mass. App. Ct. at 148.

From the record we infer that the Commonwealth did not provide, and therefore waived, any *Dora* argument to the motion judge. Even if it had done so, and even if we were to find *Dora* applicable to the present facts so as to justify police entry into the hall and stairway, the ensuing stop and frisk would independently remain unjustified and the resulting evidence suppressed for the reasons covered above.

3. *Statements.* The defendant's postarrest statements were results of the unjustified stop and frisk. They too require suppression. See *Commonwealth* v. *Borges,* 395 Mass. 788, 795-796 (1985) (evidence excluded as tainted product of sequence in which "initial stop was improper and the subsequent actions occurred as an immediate and direct result of that illegality").

*Conclusion.* The specific supported findings of the motion judge show that the disputed contraband and statements resulted from an invalid stop and frisk and required suppression.

> *Order allowing motion to*
> *suppress affirmed.*

Rubin, J. (concurring in the result). I agree with the majority that on this record there is insufficient evidence to support a conclusion that at the time of the patfrisk of the defendant the police had a reasonable belief based on specific and articulable facts and the reasonable inferences that follow therefrom that the defendant was armed and dangerous. *Commonwealth* v. *Silva,* 366 Mass. 402, 405-406 (1974).[1] I would not address the separate question, which is not necessary to our decision, whether there was reasonable, articulable suspicion of criminal activity sufficient to support the stop of the defendant in the apartment building prior to that patfrisk.

---

[1] I would also note that in his very limited testimony about the patfrisk Officer Flaven did not suggest that either he or his partner had any subjective suspicion that the defendant was armed or dangerous.