Kaplan, Mitchell H., J.
A Suffolk County grand jury returned indictments against the defendant, Nathaniel Rivers, for unlawful possession of a firearm, possession of ammunition without a firearm identification card, carrying a loaded firearm, and assault and battery on a police officer. The case is before the court on the defendant’s motion to suppress evidence that was seized and statements that were made by him on June 11, 2010. The defendant contends that this evidence was seized in violation of rights afforded him under the United States Constitution and the Massachusetts Declaration of Rights, and that statements that he made following his allegedly unconstitutionally stop were fruits of the poisonous tree. The court convened an evidentiary hearing on the defendant’s motion on November 29, 2010. The Commonwealth presented the testimony of four Boston Police Officers: Stephen O’Neil, Evan Nunez, Michael O’Rourke and Shawn McCarthy. Two exhibits were admitted in evidence. For the following reasons, the defendant’s motion is DENIED.
FACTS
In consideration of the testimony presented and the exhibits admitted in evidence, the court makes the following findings of fact.
Officer O’Neil has been a member of the Boston Police Department for almost four years. On June 11, 2010, he was on patrol, in uniform, driving a marked cruiser in area B-2, which includes Roxbuiy. At approximately 6:55 p.m., he heard a radio dispatch reporting two black males fighting near the corner of Maple and Sonoma Streets in Roxbuiy. One of the suspects was described as five foot, five inches tall, heavyset, and wearing a stripe dress shirt and blue jeans. The other suspect was described as a black male, five feet, seven or eight inches in height, skinny, and wearing a black hoodie and blue jeans. One of the suspects was reported to have a knife. A subsequent radio dispatch reported that one of the suspects was a black male in his early twenties who was wearing a white tee shirt and jeans, appeared to be five feet, six inches tall and of medium build, and was running while holding his waist band as if he had a gun. These radio dispatches were based upon statements by two civilian witnesses who phoned the police to report the fight. The first witness reported that she and others with her had seen two black males fighting at the corner of Maple and Sonoma Streets. She reported having seen one man with a knife and the other running holding his waist as if he had a gun. She reported that one man was five feet five, real heavy and wearing a striped dress shirt and jeans. The other man was five feet seven or eight, skinny and wearing a black hoodie. When asked, she declined to give her name, but said that the officer who took her call could call her back if he needed more information. The officer did call back for information about the man running with the gun, who the witness now described as wearing a white tee shirt, five feet six, average build, in his early twenties. The second caller only described a fight, many people trying to pull the men apart, and having seen a knife. She did not provide a description of either participant in the fight.
Officer O’Neil responded to the call with siren and overhead lights on. When Officer O’Neil reached Elm Hill Street, which intersects Sonoma, he turned off his siren and lights. Near the corner of Elm Hill and Sonoma he saw a black male who appeared to him to be five feet six to five feet eight with a stocky build wearing a striped polo shirt walking toward him. When this individual saw Officer O’Neil’s cruiser he stopped and started walking in the opposite direction. Officer O’Neil proceeded on to the location of the fight where he came upon an individual in the street, sweating profusely. Officer O’Neil radioed dispatch that he ha.d the individual in the black hoodie, and believed that he may have passed the second suspect, wearing a striped shirt, at the corner of Elm Hill and Sonoma.
Officer Nunez has also been a member of the Boston Police Department for approximately four years. On the evening of June 11, 2010, he was on patrol with his partner Officer Jose Teixeira in area B-2 in a marked cruiser. He was familiar with the area around Maple, Sonoma, and Elm Hill Streets, where he had *577 made arrests in the past for firearm violations and other crimes. He heard the same dispatches as Officer O’Neil and saw the dispatches transcribed on the mobile data terminal in his cruiser. He also responded to the scene of the fight. As he drove to that intersection, he heard Officer O’Neil radio that he had one suspect and believed that he had seen the second suspect wearing a striped shirt near the intersection of Elm Hill and Sonoma. Officer Nunez drove down Elm Hill toward Sonoma. As he turned left onto Sonoma, he saw a black male wearing a white polo shirt with stripes, who he thought to be around five feet, six inches tall, walking out of an alley on the right side of Sonoma. He pulled his cruiser over and asked this man, later identified as the defendant, if he would hold up a moment so that the officers could speak with him. The man stopped.
Officers Nunez and Teixeira got out of the cruiser and approached the defendant, who was then alone. Officer Nunez asked the defendant where he was coming from. The defendant said his house and pointed down Sonoma in the direction of Maple. Officer Nunez noted that this was not the direction from which he had seen the defendant walking. He also noted that the defendant was sweating a little. Officer Nunez explained that they were investigating a fight on the corner of Maple and Sonoma; the defendant responded that he did not know about that, as he was coming from his house. At that point, a black female walked up and grabbed the defendant’s shirt as if she was trying to pull him away. She said: “that’s my boy friend” — two times. Officer Teixeira took the woman aside to speak with her.
Officer Nunez believed that the defendant was the other participant in the reported fight. Based on the radio dispatches he also believed that he might be armed. Officer Nunez told the defendant why they had stopped him and that he was going to pat-frisk him. He, nonetheless, went on to say, if the pat-frisk did not disclose evidence, the defendant would be free to go. The defendant responded “OK,” and Officer Nunez started the pat-frisk beginning with the defendant’s shoulders and armpits. As Officer Nunez began to slide his hands down the defendant’s sides, the defendant pushed the Officer’s hands down and ran off down Sonoma. Officer Nunez pursued the defendant on foot. The defendant turned into an alley, onto another street, and then into another alley. As the defendant ran, he occasionally dropped his right hand to the waist area of his right side. When the defendant turned into the latter alley, Officer Nunez was five or so feet behind him. Office Teixeira, however, had positioned himself ahead of the defendant blocking his exit from the alley. As the defendant approached Officer Teixeira, the defendant lowered his shoulder and barreled into Officer Teixeira’s chest coming up into his chin. Officer Teixeira then punched the defendant and the defendant struck Officer Teixeira back in his chest/shoulder area with a closed fist.
At that point, Officer Nunez reached the two men and a struggle ensued. As the two officers subdued the defendant, Officer Teixeira shouted “gun!” Officer Nunez then saw the butt of a firearm extending from the defendant’s right side. He tried to extract it, but it was too tightly held by the defendant’s belt, so he cut the defendant’s belt with a knife to recover the firearm, which was loaded.
Another police officer, Officer Michael O’Rourke, arrived in the alley as the defendant was being placed in handcuffs by Officers Nunez and Teixeira. He heard the defendant shouting profanities at the two officers. Officer O’Rourke assisted in escorting the defendant to a cruiser.[1] While doing so, the defendant said words to the effect: I have this case beat, next time I’ll shoot. Once the defendant was in the cruiser, Officer O’Rourke read the defendant his Miranda rights. While the defendant was being driven to the police station for booking, Officer O’Rourke heard the defendant making “bop, bop, bop” sounds, which Officer O’Rourke understood to be the defendant’s attempt to mimic the sounds of a gun firing. Later, while the defendant was in the station awaiting booking, Officer Shawn McCarthy overheard the defendant say words to the effect: next time you stop me I’ll shoot.
The defendant is listed as five foot, ten inches on his booking sheet.
RULINGS OF LAW
The defendant argues that the police did not have reasonable suspicion that he had committed or was committing a crime when he was first seized on Sonoma Street, and, therefore, that the gun and ammunition recovered from his person must be suppressed, as well as the statements that he made following his arrest. The Commonwealth contends: (1) that, when the police first encountered the defendant, they had a reasonable belief both that the defendant had committed a crime sufficient for a threshold inquiry and that they or others might be in danger because he was armed, justifying a stop and a pat-frisk; and/or (2) even if the initial attempt to pat-frisk the defendant was constitutionally infirm, the defendant thereafter committed an assault and battery against an officer that constituted grounds to arrest him and search him incident to that arrest.
The first question presented by the defendant’s motion is: when was he seized? The court finds that seizure, in the constitutional sense, occurred when Officer Nunez told the defendant that he was going to pat-frisk him. “Up until that time, the officers were engaged in a consensual interaction with the defendant for which they required no constitutional justification.” Commonwealth v. Martin, 457 Mass. 14, 19 (2010). However, after Officer Nunez said that he was going to pat-frisk the defendant, a reasonable person *578 in the defendant’s position would have believed that he was not free to leave. See Commonwealth v. Borges, 395 Mass. 788, 791 (1985).
At that point, “the police officers [could] not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing or is about to commit a criminal offense and is armed and dangerous.” Commonwealth v. Narcisse, 457 Mass. 1, 9 (2010) (emphasis in original).
In the instant case, the two prongs of the Narcisse analysis of the constitutionality of the pat-frisk factually merge. A fight occurred at the intersection of Maple and Sonoma violent enough to generate two civilian reports to the police. One report referenced a knife and, in the other, the witness thought that the suspect had a gun. In consequence, if there was adequate information to support a reasonable suspicion that the defendant was one of the participants in the fight, there was also adequate information to support a reasonable suspicion that he was armed and dangerous and should be pat-frisked for the protection of the police and others who might pass by.
Officer Nunez had the following information when he stopped the defendant: there had been a fight; witnesses reported that one man was wearing a black hoodie; Officer O’Neil reported that he had apprehended that individual; a witness had described the second participant alternatively as 5 feet, five inches, heavy set wearing a striped dress shirt and blue jeans or five feet, six inches, average build and wearing a white tee shirt; while Officer O’Neil had reported seeing someone he thought might be the other combatant, that was based only on the striped shirt and that the person he observed changed direction and walked away from the cruiser when he saw it. Then, when Officer Nunez, asked the defendant to stop a moment, he did. When asked where he was coming from, the defendant said his house and pointed in a direction other than the one from which Officer Nunez thought he saw him coming. While the court “must allow officers to take account of the possibility that some descriptive facts supplied by victims or witnesses may be in errror,” Commonwealth v. Martinez, 74 Mass.App.Ct. 240, 245 (2009) (internal quotations and citations omitted), in this case other than wearing a striped shirt, none of the descriptive elements reported by the witnesses matched the defendant. His initial responses to Officer Nunez’s questions were not evasive, and Officer Nunez did not testify that the defendant seemed nervous. Officer Nunez said that he was sweating “a little,” there is no evidence in the record that this would be unusual on a June night. (Compare Officer O’Neil’s testimony that the other combatant was sweating profusely.) There is no evidence that the defendant acted in any manner that might suggest that he was armed, such as by making furtive gestures. Finally, Officer Nunez was prepared to let the defendant go on his way, if he did not find a weapon, suggesting that the Officer felt that he needed more evidence to hold the defendant for additional questioning. While a close question the court finds that Officer Nunez may have had a hunch that the defendant was the other fighter, but he did not have a reasonable suspicion that he had committed or was committing a crime.
The defendant, however, did not submit to the pat-frisk. He pushed Officer Nunez’s hands away. That act in itself would be insufficient to establish a new intervening act that would justify the defendant’s arrest. See, Martin, 457 Mass. at 21-22. But, the defendant then fled. Again, “flight alone does not establish probable cause for a ‘second arrest.’ ” Commonwealth v. Borges, 395 Mass. 788, 796 (1985). Finally, when the defendant’s exit from the alley into which he had run was blocked by Officer Teixeira, the defendant lowered his shoulder and barreled into Officer Teixeira rising up into his chin. That act was a separate battery sufficiently distinct from the initial stop to warrant arrest. Both Officer Teixeira and Officer Nunez saw the butt of the handgun during the struggle that followed the assault and were justified in seizing the firearm. See Commonwealth v. Holmes, 34 Mass. 916 (1993) (rescript opinion), and Commonwealth v. Mock, 54 Mass.App.Ct. 276, 284-85 (2002).
The court credits Officer Nunez’s testimony that the defendant’s charge into Officer Texeira was not equivalent to a struggle to be free of restraint but a deliberate assault on a police officer. While Officer Nunez’s statement that he was going to pat-frisk the defendant, although itself not made in an abusive manner, constituted an unconstitutional seizure, a finding that such a statement provided the defendant with a right to assault an officer by barreling into his chest and shouldering him in the chin, is “too high a price for society to pay in order to deter police misconduct.” Id.
ORDER
For the foregoing reasons, the defendant’s motion to suppress is DENIED.

 The defendant’s counsel stated during argument that the other participant in the fight who Officer O’Neil came upon is approximately six feet and over three hundred pounds. There is nothing in the record that confirms this representation (or disputes it). In any event, this point has no effect on the court’s consideration of the instant motion. Having listened to the tape recording of the 911 calls, it appears that the witness confused the attire of the two participants in the fight. The heavyset man was wearing the black hoodie and the other combatant was apparently wearing the striped shirt, which she later described as a white tee shirt when the police called her back.