PRIVETTE, COMMONWEALTH vs., 100 Mass. App. Ct. 222

 
 COMMONWEALTH vs. DAVID PRIVETTE.

100 Mass. App. Ct. 222
 June 3, 2021 - September 14, 2021

Court Below: Superior Court, Suffolk County
Present: Massing, Sacks, & Singh, JJ.

 

Further appellate review granted, 489 Mass. 1102 (2022).

Firearms. Practice, Criminal, Motion to suppress. Constitutional Law, Search and seizure, Reasonable suspicion, Stop and frisk. Search and Seizure, Reasonable suspicion, Threshold police inquiry. Threshold Police Inquiry.

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress a gun and other fruits of a stop and frisk, where, given the cooperative effort by police in responding to the robbery, one officer's knowledge that the suspect had facial hair could be imputed to the officer who stopped the defendant, who had noticeable facial hair; and where, although the defendant did not otherwise exactly match the description of the suspect, the defendant's appearance as compared with that description, coupled with his direction of travel, his location seven minutes after the robbery, and his being the only person seen on the street by three separate officers searching for suspects, all in the middle of a rainy night, gave the officer making the stop reasonable suspicion that the defendant was the robber. [225-233]

INDICTMENTS found and returned in the Superior Court Department on October 10, 2018. 

 A pretrial motion to suppress evidence was heard by Elaine M. Buckley, J.

 An application for leave to prosecute an interlocutory appeal was allowed by Barbara A. Lenk, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

 Anne Rousseve, Committee for Public Counsel Services, for the defendant.

 Daniel J. Nucci, Assistant District Attorney, for the Commonwealth.

 SACKS, J. This is the defendant's interlocutory appeal from a Superior Court judge's order denying the defendant's motion to suppress a gun and other fruits of a stop and frisk. The gun and other evidence led to the defendant's indictments for armed robbery and various firearms offenses. We conclude that police

 Page 223 

 had reasonable suspicion that the defendant had just committed an armed robbery, thus justifying the stop and frisk. We therefore affirm the order denying the suppression motion.

 Background. We summarize the judge's detailed findings of fact, supplementing with additional facts from testimony that the judge explicitly or implicitly credited. [Note 1] See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). As of August 2018, Boston Police Officer Brian Doherty had been a police officer for five years and had been assigned for three years to the C-11 Dorchester area, which he already knew well because he had grown up there. On August 12, 2018, Doherty and a partner were working the midnight shift in plain clothes and an unmarked car. At approximately 3:36 a.m., Doherty received a radio transmission, on the channel dedicated to C-11 use, [Note 2] that there had been a robbery at gunpoint of a gasoline station on Morrissey Boulevard at the intersection of Freeport Street. 

 The initial transmission identified the suspect as a Black male in his late twenties, between five feet, seven inches and five feet, eight inches in height, of medium build, and wearing blue jeans [Note 3] and a blue hooded sweatshirt. This initial description did not mention that the suspect had any facial hair, a point to which we return infra. The suspect had left the gasoline station on foot in the direction of a CVS store (CVS) further south on Morrissey Boulevard, at the intersection of Victory Road. 

 Upon hearing the call, Doherty did not drive to the gasoline station, because other officers were en route. Instead, he searched the streets for the suspect. Doherty headed toward the Clam Point area, which is close to the gasoline station and the CVS. Intimately familiar with that area, Doherty knew that nearby, on the same side of Morrissey Boulevard as the gasoline station, there was a large gap in the fence that separated Morrissey Boulevard from Ashland Street, part of Clam Point. Doherty traveled on Victory Road and then drove around four side streets in the Clam Point area for approximately four to six minutes. During that

 Page 224 

 time, Doherty observed no one walking on the streets. It was raining at the time. 

 At 3:43 a.m., seven minutes after hearing the first broadcast about the robbery, Doherty turned from Mill Street onto Ashland Street. There Doherty saw a man, later identified as the defendant, walking at a normal pace in the direction of Doherty's unmarked car. Along with the rain, the area was poorly lit. Doherty observed that the defendant was a Black man, of the same approximate age as on the broadcast, and that he had noticeable facial hair, consisting of a beard. He was wearing a green sweater and black jeans. [Note 4] He was also wearing a red plaid backpack. He was later determined to be thirty-two years old and five feet, eleven inches tall. 

 Doherty parked, approached the defendant on foot, identified himself as a Boston police officer, and instructed the defendant to show his hands. The defendant did so, without attempting to run or otherwise evade Doherty. Because the armed robbery had occurred a short time earlier, and because the defendant was the sole person seen walking in the area of the robber's "flight path," Doherty conducted a patfrisk. He felt the front pocket of the defendant's jeans, felt a large wad of cash, removed it from the defendant's pocket, and then immediately returned it to the defendant. 

 At the same time, Boston Police Lieutenant Darryl Dwan arrived on the scene. [Note 5] Dwan had been working a detail on Victory Road on the other side of Morrissey Boulevard when he heard the first radio call about the robbery. Dwan, driving his private car, proceeded on Victory Road toward Morrissey Boulevard and the CVS to look for the suspect. Seeing no one, Dwan turned north onto Morrissey Boulevard, drove to the gasoline station, made a U-turn, and drove south again to the CVS. He was scanning the street the entire time but did not see anyone. 

 As Dwan drove, he heard an updated radio description, which included the detail that the suspect had facial hair. Dwan continued

 Page 225 

 on Victory Road, turned north on a Clam Point side street, and proceeded to where it intersected with Ashland Street. There he saw a man in dark clothing, wearing a backpack, walking away from him on Ashland Street; the man, later identified as the defendant, was the only person on the street. Dwan turned left onto Ashland Street, parked, and got out of his car. At the same time, he could see officers approaching the defendant from the other end of Ashland Street. [Note 6] Dwan approached the defendant from behind; once the defendant removed his backpack as instructed, Dwan conducted a patfrisk of the outside of the backpack. He located a hard object that "felt like the butt end of a firearm." He opened the backpack and found a silver gun near the top, as well as a blue hooded sweatshirt. 

 Boston Police Officer Luis Lopez was also working in the area that night, in uniform and in a marked cruiser. Lopez concentrated his search efforts in the Victory Road area near the CVS, but he saw no one. After the defendant was stopped and frisked, a decision was made to conduct a showup identification procedure, so Lopez was instructed to pick up the robbery victim at the gasoline station and bring him to where Doherty and Dwan were holding the defendant. Lopez did so. Upon seeing the defendant, the victim stated, "I'm 99.9 percent sure that's him. But, he doesn't have the blue hoodie on." The defendant was arrested.

 After he was indicted, the defendant moved to suppress the fruits of the stop and frisk as not justified by reasonable suspicion that he was the armed robber. The judge denied the motion. [Note 7] The defendant then obtained leave to pursue this interlocutory appeal.

 Discussion. In reviewing a ruling on a motion to suppress, "we adopt the motion judge's factual findings absent clear error," Isaiah I., 450 Mass. at 821, and "conduct an independent review of [her] ultimate findings and conclusions of law," Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002). We are "free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings." Commonwealth v. Va Meng Joe, 425 Mass. 99, 102 (1997).

 Page 226 

 "To justify a police investigatory stop under the Fourth Amendment [to the United States Constitution] or art. 14 [of the Massachusetts Declaration of Rights], the police must have 'reasonable suspicion' that the person has committed, is committing, or is about to commit a crime" (citation omitted). Commonwealth v. Costa, 448 Mass. 510, 514 (2007). The parties agree that the defendant was seized at the moment Doherty instructed him to show his hands. We thus focus on whether, at that moment, Doherty had a reasonable suspicion that the defendant had committed the armed robbery. [Note 8]

 Before reviewing the factors relevant to that determination, we first consider whether the reasonable suspicion calculus may take into account that the updated description, heard by Dwan before the stop, included the fact that the suspect had facial hair. This fact is significant because Doherty, before stopping the defendant, observed that the defendant had a beard. If Dwan's knowledge may be imputed to Doherty under the collective knowledge doctrine, see Commonwealth v. Roland R., 448 Mass. 278, 285 (2007), then Doherty would have an additional basis for reasonable suspicion that the defendant was the robber.

 1. Knowledge that suspect had facial hair. Doherty gave internally contradictory testimony regarding whether, when he stopped the defendant, he was aware that the suspect had been described as having facial hair, and the judge did not resolve that conflict. We therefore turn to Dwan's knowledge.

 Dwan testified that he heard not only the initial radio call for the armed robbery but also, as he drove on Morrissey Boulevard looking for the suspect, an updated description. Asked whether he remembered any parts of that description, Dwan replied, "I believe it was a [B]lack male, late 20's, facial hair of some sort, wearing a blue hooded sweatshirt, blue jeans." 

 The judge made no finding regarding this part of Dwan's testimony, but "an appellate court may supplement a motion judge's subsidiary findings with evidence from the record that 'is uncontroverted and undisputed and where the judge explicitly or 

 Page 227 

implicitly credited the witness's testimony.'" Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015), quoting Isaiah I., 448 Mass. at 337. We "may do so only so long as the supplemented facts do not detract from the judge's ultimate findings" (quotation and citation omitted). Jones-Pannell, supra. Here, (1) the judge generally credited Dwan's testimony, without any explicit or implicit qualification; (2) Dwan's testimony was uncontroverted and indeed confirmed by the recordings in evidence; [Note 9] and (3) supplementing the findings with Dwan's testimony would not detract from the judge's ultimate findings. [Note 10] We are thus free to, and do, consider it as showing Dwan's knowledge that the description included facial hair.

 This implicates the collective knowledge doctrine. "In determining whether police officers have reasonable suspicion for making a stop, 'the knowledge of each officer is treated as the common knowledge of all officers' and must be examined to determine whether reasonable suspicion exists" (citation omitted). Roland R., 448 Mass. at 285. "Where a cooperative effort is involved, facts within the knowledge of one police officer have been relied on to justify the conduct of another." Commonwealth v. Quinn, 68 Mass. App. Ct. 476, 480 (2007), quoting Commonwealth v. Riggins, 366 Mass. 81, 88 (1974).

 Here, Doherty and Dwan were both involved in responding to the armed robbery. They were cooperating by monitoring the same radio channel in order to search for the suspect and can be heard reporting their observations and actions on that channel. And they approached the defendant from opposite directions at 

 Page 228 

essentially the same time. Dwan's knowledge that the suspect reportedly had a beard is thus imputed to Doherty, even if Dwan never communicated that knowledge to Doherty. See Commonwealth v. Mendez, 476 Mass. 512, 519 n.8 (2017); Commonwealth v. Montoya, 464 Mass. 566, 576 (2013); Quinn, supra at 477-478, 480-481. [Note 11] Likewise, Dwan's knowledge that he saw no one walking in the Morrissey Boulevard or Victory Road areas in the minutes immediately after the robbery, and Lopez's knowledge that he searched for a suspect but saw no one in the Victory Road area near the CVS, is also imputed to Doherty.

 2. Reasonable suspicion. "Reasonable suspicion must be 'based on specific, articulable facts and reasonable inferences therefrom'" (citation omitted). Costa, 448 Mass. at 514. The standard is an objective one: "would the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate?" Commonwealth v. Mercado, 422 Mass. 367, 369 (1996), quoting Terry v. Ohio, 392 U.S. 1, 2122 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Kansas v. Glover, 140 S. Ct. 1183, 1187 (2020), quoting Prado Navarette v. California, 572 U.S. 393, 397 (2014). In determining whether an officer has reasonable suspicion justifying a stop, a court does "not examine each fact known to [the officer] at the time of the stop in isolation; instead [a court] view[s] the 'facts and inferences underlying the officer's suspicion . . . as a whole when assessing the reasonableness of his acts.'" Isaiah I., 450 Mass. at 823, quoting Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981). Further, "[a]n officer does not have to exclude all the possible innocent explanations for the facts in order to form a reasonable suspicion." Isaiah I., supra, citing Commonwealth v. Deramo, 436 Mass. 40, 44 (2002).

 Here, at the time of the stop and including the knowledge

 Page 229 

 imputed from Dwan and Lopez, Doherty knew that the suspect had departed the gasoline station on foot, heading in the direction of the CVS on Morrissey Boulevard; that Dwan, in his two passes in his private car along the relevant part of Morrisey Boulevard and adjoining portions of Victory Road, had seen no one at all on foot; and that Lopez had not seen anyone along Victory Road near the CVS. Doherty also knew that just south of the gasoline station, on the same side of Morrissey Boulevard, there was a gap in a fence that gave easy access to Ashland Street in the Clam Point neighborhood. Doherty drove around four side streets in Clam Point for approximately four to six minutes and, like Dwan, saw no one on the street. It was by now about 3:43 a.m. and raining -- factors that could reasonably be expected to cause few persons to be on the street.

 Doherty knew that the suspect was described as a Black male in his late twenties, between five feet, seven inches and five feet, eight inches in height, of medium build, with facial hair, and wearing blue jeans and a blue hooded sweatshirt. Doherty then saw the defendant -- the first pedestrian he, Dwan, or Lopez had seen in the area -- walking toward him (and away from the direction of the gasoline station) on Ashland Street. The defendant was a Black male, with a beard, wearing a dark sweater and what Doherty initially described as blue jeans, and "roughly meet[ing]" the description of the suspect's age. [Note 12] The point at which Doherty saw the defendant was about 700 feet away from the gasoline station, a distance easily traversed on foot in the seven minutes since the robbery. We conclude that although the defendant did not exactly match the description, the defendant's appearance compared with that description, coupled with his direction of travel, his location seven minutes after the robbery, and his being the only person seen on the street by three separate officers searching for suspects -- all in the middle of a rainy night -- gave Doherty reasonable suspicion that the defendant was the robber. 

 We first observe that the description here went beyond the sort of "bare-bones description" -- "a young Black man in a black hoodie and blue jeans" -- that we hold today in a separate decision to have been insufficient, even together with other factors, to support reasonable suspicion for a street stop in a busy commercial area. Commonwealth v. D.M., 100 Mass. App. Ct. 211,

 Page 230 

214-215 (2021). The description here included additional details -- the suspect's approximate age, height, build, and his facial hair -- and thus was not "so general that it would include a large number of people in the area where the stop occur[red]." Commonwealth v. Depina, 456 Mass. 238, 245-246 (2010). See Commonwealth v. Warren, 475 Mass. 530, 535 (2016) (in reasonable suspicion determination, "information about facial features, hairstyles, skin tone, height, weight, or other physical characteristics" contributes to police ability to distinguish suspect from other Black men "wearing dark clothes and a 'hoodie' in Roxbury").

 Also, a complete match to a description is not required to establish reasonable suspicion; "[p]olice 'must be allowed to take account of the possibility that some descriptive facts supplied by victims or witnesses may be in error'" (citation omitted). Commonwealth v. Emuakpor, 57 Mass. App. Ct. 192, 198 (2003). And even where, unlike here, a description is vague or general, its "value . . . in the reasonable suspicion analysis may be enhanced if other factors known to the police make it reasonable to surmise that the suspect was involved in the crime under investigation." Commonwealth v. Meneus, 476 Mass. 231, 237 (2017).

 This case is unlike Commonwealth v. Cheek, 413 Mass. 492, 493 (1992), relied on by the defendant, where the suspect was described only as "a [B]lack male with a black 3/4 length goose known as Angelo of the Humboldt group." Here, unlike in Cheek, police knew other distinguishing features, such as that the suspect "had facial hair," id. at 496, [Note 13] and his approximate age, height, and build. [Note 14] Cf. id. (knowledge of suspect's height and weight could help support reasonable suspicion). Moreover, the description in Cheek lacked details "that would have distinguished the 

 Page 231 

defendant from any other [B]lack male in the area." Id. Here, the defendant was not only the only Black male in the area but also the only pedestrian of any description in the area. [Note 15]

 We need not canvass the varying facts of each case cited by the parties in which reasonable suspicion was or was not held to be present. We do, however, briefly address certain additional points that the defendant argues weigh against reasonable suspicion here.

 a. Appearance. That the suspect wore a blue hooded sweatshirt, whereas the defendant wore a green sweater, is not dispositive. Upper-body garments may quickly be removed and either discarded or stowed in a container; alternatively, additional garments may be removed from a container and donned in order to conceal what a suspect wore at the time of the crime. Compare Commonwealth v. Martinez, 74 Mass. App. Ct. 240, 246 (2009) (no reasonable suspicion where, among other discrepancies, suspect wore blue jean shorts, whereas defendant wore long pants). [Note 16] Likewise, that the defendant carried a red plaid backpack, whereas the suspect was not described as carrying anything, does not make it unreasonable to suspect the defendant. A backpack or similar container may easily be stowed nearby immediately before a crime and then retrieved immediately afterward. Compare id. (that defendant had arm cast, unmentioned in description of suspect, detracted from reasonable suspicion).

 b. Location. The defendant suggests that it was unreasonable to suspect him of the robbery because, seven minutes after it occurred, he was only 700 feet from the gasoline station. But we know of no presumption that an armed robber will flee the area of the robbery as quickly as humanly possible. To be sure, the more time that passes after a crime, and the farther away a suspect could have traveled in that time, the less significance there may be to the location where the defendant is stopped. See Warren, 475 Mass. at 536-537. Being present in a location closer than the 

 Page 232 

maximum possible travel distance may, in some circumstances, diminish reasonable suspicion. See id. at 537. But in Warren the defendant was stopped one mile from the crime scene, about twenty-five minutes after the victim called police, in a place that was in a direction opposite from either of the reported paths of flight. See id. at 535, 537. Here, in contrast, the defendant was stopped seven minutes after the crime, 700 feet away, walking in a direction consistent with the reported flight path. "Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close." Id. at 536, citing Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 555 n.8 (2002). See Commonwealth v. Evelyn, 485 Mass. 691, 704 (2020) (court "consistently ha[s] held that geographic and temporal proximity to a recent crime weigh toward reasonable suspicion in the over-all analysis"). Compare D.M., 100 Mass App. Ct. at (that police saw juvenile on same block identified by confidential informant, within thirty minutes to three hours after informant's tip, was not particularly significant, where police were not investigating recent crime, and proximity did not help distinguish juvenile from any other Black male in area wearing "black hoodie and blue jeans").

 c. Lone pedestrian. The defendant suggests that the significance of his being the lone pedestrian encountered by the officers is diminished by the fact that they did not search a particular street on the other side of Morrissey Boulevard. It is true that a search of a wider area might have increased the significance of the defendant being the sole person seen on foot in that search. But Doherty, aided by other officers, was not required to complete a search of any particular radius around the gasoline station before finding it significant that the defendant -- the first pedestrian that any officer encountered in the area -- fit the description of the robber in a number of respects. That is particularly true where the defendant was found not only on the same side of Morrissey Boulevard as the gasoline station, but also on a street that, due to the gap in the fence near the gasoline station, was a logical flight path for the robber. 

 The defendant also suggests that, notwithstanding the late hour and the rainy weather, his appearance on the street could have been explained by his being a patron of the nearby CVS or an 

 Page 233 

adjacent Chinese restaurant. [Note 17] But an officer need not "exclude all the possible innocent explanations for the facts in order to form a reasonable suspicion." Isaiah I., 450 Mass. at 823.

 d. Behavior. The defendant suggests that the fact that he neither was acting suspiciously when spotted by Doherty nor changed his behavior once he saw Doherty further diminishes the reasonableness of Doherty's suspicion. Doherty was, of course, in plain clothes, and the area was poorly lit, making the defendant's lack of reaction to Doherty's presence less noteworthy. Cf. Depina, 456 Mass. at 240-241, 247 (defendant's obvious effort to avoid encountering police, identifiable as such as they approached, contributed to reasonable suspicion); Mercado, 422 Mass. at 371 (behavior of defendant "on seeing a police officer" contributed to reasonable suspicion). 

 Even if this particular factor diminishes reasonable suspicion here, the larger points are (1) that we look at the facts known to Doherty not in isolation, but as a whole, Isaiah I., 450 Mass. at 823; and (2) that reasonable suspicion is less than probable cause, let alone proof of wrongdoing by a preponderance of the evidence. See Kansas v. Glover, 140 S. Ct. at 1187. Cf. Matter of a Grand Jury Investigation, 427 Mass. 221, 225, cert. denied sub nom. A.R. v. Massachusetts, 525 U.S. 873 (1998) (probable cause for search is less than proof by preponderance of evidence).

 Conclusion. Considering together all the factors contributing to Doherty's suspicion, and all the factors the defendant claims weigh against it, we conclude that Doherty's suspicion was reasonable.

Order denying motion to suppress affirmed.

FOOTNOTES
[Note 1] The judge stated that she credited and accepted the testimony of the three police officers who testified at the suppression hearing. 

[Note 2] Our references to recorded radio transmissions are to those on the channel for C-11 use, except where otherwise noted. We have listened to all the recordings in the record but refer only to those that are most relevant. 

[Note 3] The judge found that the radio transmission reported "dark" jeans, but Doherty's testimony and the recorded transmission make clear that the report said the jeans were blue. 

[Note 4] Doherty initially testified, and the judge found, that the defendant was wearing blue jeans. On cross-examination, asked if the jeans were black, Doherty replied that he did not remember. After having his recollection refreshed with the booking sheet, Doherty testified that the jeans were black. The defendant asserts, and the Commonwealth does not contest, that the finding that the jeans were blue was clearly erroneous. 

[Note 5] Dwan had been on the force since 2000; he was a sergeant at the time of the incident but was later promoted. 

[Note 6] The hearing transcript makes clear that one of those officers was Doherty. Doherty testified that Dwan "arrived with me . . . . We came from one end of the street, he came from the other end of the street." 

[Note 7] The judge also concluded that the discovery of the gun and the showup identification were permissible. As the defendant does not challenge those conclusions on appeal, our factual recitation omits details regarding those issues. 

[Note 8] If Doherty had such reasonable suspicion, the defendant does not press any separate challenge to the patfrisk that ensued. "[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." Commonwealth v. Narcisse, 457 Mass. 1, 7 (2010), quoting Arizona v. Johnson, 555 U.S. 323, 326-327 (2009). Reasonable suspicion that the defendant had just committed an armed robbery would also, on this record, establish reasonable suspicion that he was armed and dangerous. 

[Note 9] Two updated descriptions mentioning facial hair were broadcast, on the channel for C-11 use, before Doherty saw and stopped the defendant at 3:43 a.m. Particularly in light of this confirmation of Dwan's testimony, it is of no significance that Dwan prefaced his recounting of the updated description with the phrase "I believe." We note that in addition to the two updated descriptions just mentioned, two other recordings confirm that the suspect was described as having a beard or facial hair. These included the victim's statement in his call to the 911 operator and a broadcast approximately one minute thereafter on another channel, shown in the record as corresponding to "BAPERN CENTRAL." There being no evidence that Dwan heard those two other recordings and that the speakers were officers involved in the effort to apprehend the robber, we do not rely on those statements to establish Dwan's knowledge. 

[Note 10] Contrary to the defendant's contention, the judge's finding, in discussing Doherty's knowledge, that "[t]here was no mention in the original broadcast about facial hair" in no way "excludes the possibility that the judge found that Dwan heard the subsequent description prior to the stop." The two facts are independent of each other. 

[Note 11] Contrary to the defendant's suggestion (which is unsupported by citation to authority), application of the collective knowledge doctrine does not depend on an explicit finding by the judge that the officers were engaged in a close cooperative effort. See, e.g., Mendez, 476 Mass. at 519 n.8 (doctrine applied without mention of express finding of cooperative effort); Roland R., 448 Mass. at 280, 285 (same); Commonwealth v. Lanoue, 356 Mass. 337, 340 (1969) (same); Quinn, 68 Mass. App. Ct. at 480-481 (same; appellate court reached its own conclusion regarding cooperative effort). 

[Note 12] The defendant was thirty-two years old at the time. 

[Note 13] See also Commonwealth v. Carrington, 20 Mass. App. Ct. 525, 526, 528 (1985) (where defendant, like suspect, was Black male in his thirties with receding hairline, moustache, and beard, and was stopped not far from crime scene at 6:30 a.m., one hour after first report, police had reasonable suspicion, although defendant's clothes did not match description of suspect). 

[Note 14] That the suspect was described as five feet, seven inches or five feet, eight inches tall and in his late twenties, whereas the defendant is five feet, eleven inches tall and was then thirty-two years old, is not disqualifying. See Emuakpor, 57 Mass. App. Ct. at 198. (At oral argument the defendant disclaimed any argument based on whether he matched the description of the suspect as having a medium build.) Similarly, that the suspect was described as wearing blue jeans, whereas the defendant's jeans turned out to be black, is not fatal to reasonable suspicion. The night was rainy, the area where Doherty saw the defendant was poorly lit, and there are various shades of blue and black. 

[Note 15] Doherty could reasonably consider that the late hour and the rain had likely kept pedestrians inside unless they had a pressing reason to go out. Cf. Commonwealth v. McKoy, 83 Mass. App. Ct. 309, 310, 313 (2013) (that defendant and companion were alone on street on "cold, windy, wet night filled with snow and slush" contributed to reasonable suspicion). 

[Note 16] Nor is this a case where the defendant wore distinctive clothing, the absence of which from the description of the suspect may be significant. Compare Meneus, 476 Mass. at 233, 237 (defendant wore "black bomber jacket with a visibly distinctive orange lining"). 

[Note 17] A radio transmission made fifteen minutes after the defendant was stopped suggests that the CVS was open at the time. There is no record evidence regarding whether the restaurant was open. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.